In the Matter of the Estate of WILLIAM B. GUTHERY, deceased, ELLA GUTHERY, Complainant, Respondent, v. N. M. WETZEL, Administrator, Appellant.

Kansas City Court of Appeals, November 29, 1920.

1. **ADMINISTRATION: Appointment of Administratrix: Widow who Married Husband Claimed to be Mentally Incompetent While on His Deathbed, Properly Appointed.** Widow properly appointed administratrix, although her right to act was contested on the ground that she had married husband when he was on his deathbed and at a time when he was mentally incompetent to understand the nature of marriage ceremony.

2. **EVIDENCE: Mental Capacity: Marriage: Presumption: Property Rights.** In view of the extremely strong presumption of legality in favor of marriage and the fact that at most only property rights are involved, the evidence was sufficient to support a finding that deceased was mentally capable of understanding marriage ceremony.

3. **MARRIAGE: Voidable Marriage Attacked Only in Direct Proceeding by One of the Parties During Their Lives.** A voidable marriage can only be inquired into by direct proceedings by one of the parties during the lives of both of them and unless it is set aside during such lives it becomes a valid marriage.

4. **MARRIAGE WITH INSANE PERSON VOIDABLE NOT VOID IN THIS STATE.** In view of sections 8280 and 8281, Revised

Statutes 1909, a marriage between persons, one of whom is of unsound mind, is voidable and not void in this State.

Appeal from the Daviess County Circuit Court.—*Hon. Arch B. Davis,* Judge.

Affirmed.

*M. E. Pangburn, W. W. Davis* and *Frank W. Ashby* for respondent,

*Dudley, Selby & Brandom* for appellant.

BLAND, J.—William B. Guthery died on the ·4th day of March, 1918, while a resident of Daviess County, Missouri, and appellant was appointed administrator of his estate. The letters of administration were issued without renunciation or consent on the part of the widow and the court on her motion revoked the appointment of appellant and appointed her as administratrix. There was an appeal to the circuit court of Daviess county where a jury was waived and after trial a judgment sustaining the action of the probate court was entered. The right of the widow to act was contested on the ground that she had married the said Guthery when he was on his death bed and at a time when he was mentally incompetent to understand the nature of the marriage ceremony.

The facts show that deceased was a farmer and that Ella Ball some years prior to his death came to his house as a housekeeper; that the deceased was a man past seventy years of age at the time of his death and had been in bad health for several years prior thereto. On February 15, 1917, he suffered a slight stroke of paralysis which resulted in his being confined to his home, either in his bed or about the premises, until sometime during the latter part of May or first part of June of that year. On March 9, 1918, deceased suffered from a second stroke of paralysis from which he died. He was married to Ella Ball about 11:00 A. M. on the day of his death and

died about 7:00 P. M.   Ella Ball called in a justice of the peace for the purpose of performing the ceremony.   The justice testified that he found Guthery either in a stupor or asleep; that he was lying on the bed on his back with his legs out straight and his arms on his body; that Ella Ball raised him up and he shook hands with the justice and in doing so raised his hand five or six inches. The justice said that Guthery recognized him.   The justice knew that he was a sick man and had suffered a stroke of paralysis and he wanted to be sure before performing the ceremony that Guthery was capable of understanding the nature of the act, so he called in the nurse, Mr. Merifield, and the latter raised deceased up and put a box upon his knees and gave him a pencil and told him to write his name.   Deceased thereupon wrote his name, then he was told to write "Jameson, Missouri," his post office, and he wrote "Jameson, Missouri," and the letters were well formed although they appeared to be written by a nervous man.   The nurse laid him back on the bed and the justice asked Guthery if he realized that he was to be married to Ella Ball and he turned his head sidewise, said "Uh-Huh" and nodded his head in the affirmative.   The paralysis had deprived him of his speech and this was the only sound he made while the justice was there.   The justice then said "join hands," and deceased then took hold of the hand of Ella Ball, and the justice performed the ceremony.   The nurse testified that deceased could use his right arm and his left limb in fairly good shape and that when he needed a glass of water he could take the glass in his hand and drink out of it; that at the time of the marriage he was unable to sit up and grew progressively weaker from the time he was stricken until his death; that he could not talk but that he could nod or shake his head if he was asked anything and he could write; that on the day before his death he desired something and could not make his wants understood but that he wrote on a piece of paper the word "ice" and the nurse sent to town and got him some ice.   The evidence on behalf of respondent tended to show that at

the time of the marriage the paralysis had largely destroyed deceased's muscular action including the power of speech, but that his mind was clear and sound.

Appellant produced no witness that was present at the time of the marriage. Appellant, who was deceased's doctor, testified that he was there only a short time before the marriage and at that time the mental condition of deceased was such that he could not have understood the nature of the act. Defendant also produced other testimony, including expert testimony, to the effect that at the time of the marriage deceased was not mentally capable of understanding the nature of the marriage ceremony. Without detailing the facts further, it is sufficient for us to say that I have carefully studied the record and am of the opinion that there was ample evidence to support a finding that deceased was mentally capable of understanding the marriage ceremony in view of the extremely strong presumption of legality in favor of the marriage, 18 R. C. L., pp. 427, 428, and the fact that at most only property rights are involved. [Henderson v. Henderson, 141 Mo. App. 540, 559; Henderson v. Henderson, 265, Mo. 718, 730, 735.]

However, appellant states in his brief that the court based its finding in this case squarely on the proposition that if the deceased was incapable of understanding the nature of the act, the marriage was not void but only voidable and could not be disturbed after his death. Respondent in her brief agrees with this statement of appellant. There is no contention that appellant is attempting to collaterally attack the marriage. While the record contains no finding of fact or declarations of law, it does state that the court made and filed his finding of facts and law but for some reason, appellant says, the court failed to file such findings. In view of this situation and the admissions of the parties as to the grounds upon which the judgment was rendered, in fairness to appellant, I have decided to voluntarily go into the question as to whether or not the marriage, conceding that deceased was mentally incapable of understanding the nature of the act, was void or voidable.

It is well settled that a voidable marriage can only be inquired into by direct proceedings by one of the parties during the lives of both of them and unless it is set aside during such lives it becomes a valid marriage. [Henderson v. Henderson, supra, l. c. 728, 729; 18 R. C. L., p. 447.] This being a fact, of course, if the marriage in the case at bar was voidable only it cannot be attacked now that one of the parties is dead. At English common law the marriage of a person of unsound mind was absolutely void and was open to a collateral attack. Present day civilization looks with disfavor on the harsh doctrine of *ab initio* nullity of marriages, and in both England and America this rule has been greatly modified. The tendency has been to make such marriages voidable rather than void. [18 R. C. L., pp. 439, 440.] On account of the tendency of Legislatures and the courts of this country to get away from the strict common law rule, there has resulted a great variety of opinion on the subject. Our marriage statute, chapter 76, Revised Statutes 1909, provides as follows:

"Sec. 8279: Marriage is considered in law as a civil contract, to which the consent of the parties capable in law of contracting is essential."

"Sec. 8280: All marriages between parents and children, including grandparents and grandchildren of every degree, between brothers and sisters of the half as well as of the whole blood, and between uncles, nieces, aunts and nephews, first cousins, white persons and negroes, white persons and mongolians, are prohibited and declared absolutely void, and this prohibition shall apply to illegitimate as well as legitimate children and relatives."

"Sec. 8281: All marriages, where either of the parties has a former wife or husband living, shall be void, unless the former marriage shall have been dissolved."

It is insisted that in view of section 8279, Revised Statutes 1909, unless the parties are capable in law of contracting generally, the marriage is void. In the case of Payne v. Burdette, 84 Mo. App. 332, it was held that

the marriage *status* is one in which the general public is concerned as well as the individuals contracting the same, and that section 8279 does not mean that the parties shall be capable in law of making contracts generally but that such parties must be capable in law of contracting a *valid marriage contract*. The Payne case likewise holds that section 512, Revised Statutes 1909, which makes contracts of persons of unsound mind under guardianship absolutely void, does not apply to marriage contracts, but that a person under guardianship may legally contract a valid and binding marriage and it may not be annulled if such person was actually of sound mind at the time of the marriage. It is stated in Johnson v. Johnson, 45 Mo. 595, 599—

"Whilst marriage is a civil contract, and the assent of capable minds is necessary to its validity, still it differs in many particulars from ordinary, general or commercial contracts."

This holding is based upon the ground that society as represented by the State is interested in such contracts, and that marriage unlike other contracts may not be dissolved by a mere consent of the parties.

The legislature in enacting sections 8280 and 8281, Revised Statutes 1909, has singled out the marriages that are absolutely void in this State, leaving, I think, a necessary inference that it was the intention that all other prohibitive marriages should be voidable only. Of course, marriages between persons of unsound mind were prohibited at common law, and are prohibited in this State, but they are not declared absolutely void by the statute. I can include in a class of absolutely void marriages the marriage in the case at bar only by enlarging the statute, and this I have no right to do. The subject is purely legislative. I think there is no question but that in view of the statute, supra, a marriage between persons, one of whom is of unsound mind, is voidable and not void in this State. [State v. Yoder, 113 Min. 503; In the Matter of the Estate of Mary J. Gregorson, 160 Calif. 21; Gross v. Gross, 96 Mo. App. 486, 489; Johnson v. Johnson, supra, l. c. 600.]

It has long been well settled in this State that a deed executed by a person of unsound mind not under a legal guardian is not void but only voidable. [Wiggenton v. Burns, 216 S. W. 756, 759, and cases therein cited.] If in this State deeds entered into by a person of unsound mind are only voidable, I fail to see why a marriage contract entered into by such a person should be declared void until annulled. Far greater and more disastrous results might occur from a holding that marriages entered into by persons of unsound minds are absolutely void than by holding that deeds under such circumstances are nullities. The holding that such marraiges are absolutely void might cause innocent offspring to suffer the greatest humiliation in addition to property loss, as well as other persons who are innocent of any intentional wrong doing. For these reasons I think that the Legislature has wisely excluded from those prohibited marriages that are declared absolutely void marriages when one of the contracting parties is of unsound mind.

The judgment of the court was proper, therefore, it is affirmed. *Ellison, P. J.,* and *Trimble, J.,* concur in the result.