### SIMPSON et vir. v. NEELY.

### No. 2827.

Court of Civil Appeals of Texas. Waco.
March 17, 1949.

Rehearing Denied June 9, 1949.

304

Jerome Sneed, Jr., Louis Scott Wilkerson, Austin, for appellants.

Fitzpatrick & Dunnam, Waco, for appellee.

LESTER, Chief Justice.

This appeal involves the contest of an application to have admitted to probate the

will of W. E. Neely, deceased. The proponent, Miss Mattie Neely, a sister of the deceased, was named as the sole beneficiary under the terms of said will. The deceased executed his will on January 13, 1930, and the next day he delivered to the proponent a copy thereof. He died on May 4, 1943. The deceased left surviving him his widow, mother, a brother, three sisters and several nephews and nieces, who were living, at the time of the trial in the district court, except his mother, who died in February, 1946, but only the surviving widow filed a contest to the application to probate said will, alleging that she was the surviving widow of the deceased and denying that said instrument was a valid will, alleging that the same had been revoked by the deceased during his lifetime. She further pleaded estoppel, res judicata, etc.

The proponent filed her supplemental petition, in which she denied: (1) that the contestant and the deceased were ever husband and wife, in that at the time of the alleged marriage the deceased was of unsound mind and did not possess sufficient mental capacity to enter into the marriage relation with the contestant, and by reason of such, said alleged marriage was rendered wholly void and of no force and effect, and that the contestant had no interest in said estate and no right to contest the probate of said will. (2) That if it should develop on the trial that the deceased removed or obliterated his name from said will, or caused the same to be done in his presence, that at the time thereof said deceased was of unsound mind and did not possess sufficient mental capacity to understand his alleged physical acts in so doing, and that therefore said alleged removal of deceased's name from said will was of no force and effect and did not in any manner impair the validity of said will. (3) Denied that the will was ever revoked, destroyed, cancelled or obliterated by the deceased, or that the deceased caused the same to be done in his presence; that if it should be found that said instrument was mutilated, it was done without the knowledge, acquiescence or consent of said deceased and was done by persons other than deceased and whose name or names are by the proponent unknow-

The county court admitted the will to probate. The contestant appealed to the district court and the case was tried de novo upon the same pleadings as were filed in the county court. Upon the conclusion of the evidence the contestant filed her motion for an instructed verdict, which was overruled, and the court submitted the case upon six special issues. The jury were not required to answer Issues Nos. 2, 3 and 4 if they answered Issue No. 1 in the affirmative, which they did, and made the following findings: To Special Issue No. 1 the jury found that some person other than the deceased cut the signatures from said will. To No. 5 the jury found that at the time of the marriage ceremony between the deceased and the contestant the deceased was of unsound mind. To No. 6 the jury answered that prior to August 3, 1945, the proponent did not agree that if contestant would waive her right to be appointed administratrix of the estate of the deceased the proponent would not try to secure probate of the instrument in question as the will of the deceased.

The contestant filed a motion for judgment non obstante veredicto, which the court overruled. Based upon the answers of the jury the court entered judgment admitting the instrument to probate as the last will and testament of the deceased, and the judgment contained the following provision: "It is further ordered, adjudged and decreed that the marriage entered into by the deceased and the contestant on July 4, 1942, be and the same is hereby cancelled, dissolved, annulled, held for naught and declared void and of no force or effect." Contestant's motion for a new trial being overruled, she has perfected her appeal.

Contestant's first point is that the trial court erred in including in its judgment an adjudication purporting to avoid the marriage between deceased and contestant. Proponent's first contention is that a marriage of a person of unsound mind is wholly void and of no force and effect, and that same can be attacked collaterally by anyone in any court or place where the question is raised; and second, that the attack made upon the marriage included a direct attack as well as collateral, and since the jury found that the deceased was of unsound

mind at the time he married, the court did not err in annulling said marriage.

The evidence reveals that the deceased was sixty-eight years of age when he married in 1942 and the contestant was sixty-four when the case was tried below. Deceased had been married once prior thereto and she had been married twice. They had known each other for many years and had corresponded with each other for several years before said marriage and he would visit the contestant every two or three months at her home in Austin, Texas. On July 3, 1942, a marriage license was issued by the County Clerk of Travis county authorizing them to be married, and on July 4, 1942, the marriage ceremony was performed in the First Presbyterian Church at Austin by the pastor of said church in the presence of witnesses and the license was returned and recorded as required by law on the 8th day of July, 1942. Two or three days after their wedding ceremony they went to Moody and lived in the home of his mother, where the deceased was living at the time of the marriage and where he had been living for several years prior thereto, and they continued to live there as their home as husband and wife until his death on May 4, 1943. The contestant performed her household duties such as cooking, keeping house, etc., and conducted herself in a manner in keeping with the relationship of husband and wife. They were generally considered and recognized as husband and wife and no question was raised as to the validity of said marriage until in August, 1945, more than two years after the death of the deceased. The evidence further discloses that the deceased was examined in November, 1941, and found to be suffering from syphilis in the third stage.

The first question is, is the marriage of an insane person void or only voidable? If absolutely void and of no effect, and if not subject to ratification during the lifetime of the insane, then the attack made upon it by the proponent was proper and the court below committed no error in this respect.

Under the common law of England the marriage of an insane person was void ab initio on the theory that a person of unsound mind is unable to consent to such marriage. If we are bound by that rule in Texas, then under the findings of the jury in this case that the deceased was of unsound mind when the marriage ceremony was performed, the proponent is within her rights in maintaining that said marriage is of no legal force or effect because the same is an absolute nullity, and the contestant would have no interest in the subject matter and therefore no right to contest the probate of said instrument. Abrams v. Ross, Tex.Com.App., 250 S.W. 1019 et seq; Moore v. Stark, 118 Tex. 565, 17 S.W.2d 1937.

In support of proponent's contention that the marriage is void ab initio, she cites: Articles 1, 3315, 4604, 4604c and 4628, Revised Civil Statutes of Texas, Vernon's Ann.Civ.St. arts. 1, 3315, 4604, 4604c, 4628; 38 C.J. p. 1285, Sec. 14; 55 C.J.S., Marriage, § 12; three Texas cases and several cases from foreign jurisdictions. The Texas cases are as follows:

Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124, L.R.A.1915E, 1, Ann.Cas.1915C, 1011, in which insanity was not involved but a common law marriage was, and the question was whether a mere agreement between a man and a woman to become husband and wife without cohabitation constituted a common law marriage. The court held that the mutual consent of the parties is necessary to the creation of the marriage relation, the contract being a civil contract in that a church ordinance or rite is not required. Speaking of the common law of England the court said: "The act of Congress of the Republic of Texas of 1840 (Laws 1840, p. 3; Rev.St.1895, Art. 3258) [which is now Article 1 of Vernon's Ann.Civ.Stats.], providing that the common law of England, so far as not inconsistent with the Constitution and laws of the State, shall be the rule of decision unless altered or repealed, means the common law declared by the courts of the several states, and not the common law in force in England in 1840," and by the adoption of the same it "was intended to effectuate the provisions of the common law so far as not inconsistent with the conditions and circumstances of the people of the state."

Holland v. Riggs, 53 Tex.Civ.App. 367, 116 S.W. 167, 171 (writ refused). Mary

2

Belle Riggs was an infirm, insane woman. Holland was a man about thirty-nine or forty years old. Mary Belle Riggs came into court by next friend to have a deed set aside that Holland had procured from her by his alleged fraud and without consideration, and on the ground that she was a non compos mentis. Just a few days before the trial was had Holland married her and the jury found that she was insane at the time the deed was executed and at the time of the marriage. Holland contested her right to maintain the suit against him after said marriage, and the court said in part: "Such a proceeding would be denying to the insane wife that degree of protection which the law accords to the wife when of sound mind. If, at the time of the marriage and subsequent thereto, Mary Belle Riggs was mentally incapable of entering the marriage relation, as is charged, then the marriage was a nullity, and could have no legal effect whatever on the rights of the parties to the suit, and could confer upon Holland no more rights over the property of Mary Belle Riggs than he possessed before". Both parties were living and before the court, and if the pleadings had been sufficient, the court could and would have rightfully declared the marriage void by reason of her insanity, which would have been a direct suit to have it declared invalid. The court reformed the judgment of the lower court so as to eliminate that part of the judgment annulling the marriage, which is indicative that the court was of the opinion that such marriage could not be collaterally attacked.

In Smith et ux. v. Monroe et al., Tex. Civ.App., 1 S.W.2d 358, 362, Mrs. Monroe came into court by next friend and sued to cancel certain deeds and to annul her marriage on the ground of insanity, and the court granted an injunction against Smith, the husband, pending the trial of the case and Smith appealed. The court said, in point 1:

"It cannot be contended that a district court is without jurisdiction to annul a marriage on the ground that the woman was mentally incapable of understanding the nature of her act at the time of the marriage. Marriage contracts, like contracts of any other kind, depend upon the consent of the parties, and if one of the parties is mentally incapacitated to such an extent as not to understand the nature of his or her act, then there can be no contract, and our courts will, upon a showing to that effect, annul or rescind upon application therefor."

We have carefully read all of the authorities from other states cited by the proponent. The decisions wherein insanity was involved are based upon a statute which provides that the marriage of an insane person is void. This applies to all of such decisions except the case of Kuehmsted v. Turnwall, 103 Fla. 1180, 138 So. 775, by the Supreme Court of Florida, in which the court said that the common law rule had not been modified by statute and held said rule was in force in that state. The other authorities are divided into two categories: (1) where the courts had under consideration bigamous marriages and marriages of persons of different races, all of which were prohibited by the statutes of the various states; and (2) involved the contract of an insane person, wherein it was held that the contract of an insane person was void ab initio.

In this state a contract of an insane person is not void but only voidable, in that a contract made by one insane at the time the contract is entered into may be ratified by such person if and when he recovers from his insanity or if he should have lucid intervals after entering into said contract. Bolton v. Stewart, Tex.Civ.App., 191 S.W. 2d 798; Lewis v. Blount, Tex.Civ.App., 139 S.W. 7; Mitchell v. Inman, Tex.Civ. App., 156 S.W. 290 (writ ref.); 24 Tex. Jur., p. 380, sec. 7, and cases cited in Vol. 6, p. 9 of Tex.Jur. 10 year Supplement 1937–1947. As to marriage contracts see 35 Am.Jur. pp. 212–213, Sec. 46 and p. 248 Sec. 108.

There is no statute in this state forbidding the marriage of a person of unsound mind, nor is there a statute expressly declaring that such a marriage shall be void. Art. 4628 Vernon's Ann.Civ.Stats., provides that "the marriage relation may be dissolved where the causes alleged therefor shall be natural, or incurable impotency of body at the time of entering into the marriage contract, or any other impediment

that renders such contract void, and the court may decree the marriage to be null and void." Speer on Marital Rights, 3rd ed., p. 22, Sec. 20, treating of void and voidable marriages, in part states:

"Mr. Bishop defines a void marriage to be one that is good for no legal purpose, and whose invalidity may be maintained in any court between any parties, whether in the lifetime or after the death of the supposed husband or wife, and whether the question arises directly or collaterally. Accepting this as a correct definition, it is obvious that comparatively few marriages are void. For under the liberal rules adopted by our courts for viewing the attempted marital relations, very few of them can be said to produce none of the civil results of lawful marriage * * *. While marriages generally called void upon the ground of some existing impediment, such as impotence, nonage, insanity, and the like, are only voidable. The statute speaks of such marriages as being void, still it provides a jurisdiction for decreeing their nullity, indicating that they are voidable only, as that term is commonly understood."

Vol. 28, Tex.Jur., p. 731, Sec. 33, treating of void and voidable marriages, states:

"A void marriage is one that is absolutely null, having no force or effect for any purpose, at any place or time, and whose invalidity may be asserted by anyone, at any time, directly or collaterally. Thus where the parties or either of them are below the prohibited age, within the forbidden degree of kinship, or of opposite races within the miscegenation act, or where either is naturally or incurably impotent, the attempted marriage is void. It is a nullity. Where, however, the marriage is induced by fraud, deception or duress, or entered into by one incapable legally or actually of assenting, or where, for any equitable reason, the contract should be set aside, the marriage is at most only voidable, and is a valid subsisting marriage for all purposes until annulled by proper decree of a court. It is precisely the same situation as where legal grounds for a divorce exist. The marriage is valid until dissolved by decree."

Schneider v. Rabb, Tex.Civ.App., 100 S.W. 163, was a suit to have a marriage annulled on the ground of insanity of one of the parties. It was held that the contract of a lunatic is voidable, and not void in the sense that no rights or obligations of any kind can arise therefrom.

Carter v. Green et al., Tex.Civ.App., 64 S.W.2d 1069, (writ ref.) 1070, was a suit wherein the insanity of one of the spouses at the time of the marriage was raised, and the court held that it was not properly raised, but the court, in discussing the question, said:

"We can conceive of no sound reason why such a contract should be held by us to be void and will not so hold unless the Legislature has by positive law made such contracts void. An examination of the statutes has disclosed that the Legislature has never enacted a law prohibiting the marriage of an insane person. It has, however, enacted Article 4628 (Vernon's Ann. Civ.St.), which provides: 'The marriage relation may be dissolved where the causes alleged therefor shall be natural or incurable impotency of body at the time of entering into the marriage contract, or any other impediment that renders such contract void, and the court may decree the marriage to be null and void.' The language of this statute is possibly broad enough to declare a marriage contract by an insane person void, but we do not believe the Legislature used the word 'void' in its true meaning, but rather in the sense of 'voidable' only, as it is well recognized that the courts, as well as the Legislature, often use these words indiscriminately. In this particular statute we think there can be no doubt about the Legislature using the word 'void' in the sense of 'voidable,' since in the same statute it is expressly provided that 'the Court,' in the exercise of its jurisdiction, 'may decree the marriage to be null and void.' A judicial declaration of the dissolution of the marriage relation was evidently intended by the statute."

The court further said:

"We are of the opinion that the marriage contract between Mrs. Emma L. Carter and J. C. Carter, even if Emma L. Carter was insane at the time such contract was entered into, was not void but only voidable."

Carter and his wife had been married for thirty-five years. Under proponent's con-

tention the marriage was absolutely void and of no effect and no obligation of any kind could arise therefrom, if she was insane at the time of her marriage, even though they had lived together as husband and wife throughout all of those years.

■ Under the laws of Texas, a strong presumption prevails in favor of the legality of marriage. Nixon v. Wichita Land & Cattle Co., 84 Tex. 408, 19 S.W. 560, 561, quotes the following concerning such presumption:

"Every intendment of law is in favor of matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a presumption of its legality, not only casting the burden of the proof upon the party objecting, but requiring him throughout and in every particular plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void. The strength of the presumption increases with the lapse of time through which the parties are cohabiting as husband and wife."

Gress v. Gress, Tex.Civ.App., 209 S.W.2d 1003, 1005, which involved the marriage of a person who was granted a divorce on the ground of cruel treatment and who had married within twelve months after the decree, is to the same effect, and says: "The policy of the law is to look with special favor upon marriage and to seek in all lawful ways to uphold this most important of social institutions", and held that the word "void" as used in Art. 4628, providing the marriage relation may be dissolved for any impediment that rendered the contract void also included voidable. 35 Am.Jur. p. 212, Sec. 46 states: "The general rule that ordinary contracts entered into in violation of positive law are nullities and unenforceable has not, at least not by uniform trend of decisions, been held applicable to marriage contracts, for the sacred nature of the relation and obvious reasons of sound public policy forbid that the person who enters into a marriage contract even though prohibited by law may arbitrarily and without decree of dissolution, determine for himself the validity of the contract and reject or perform at his pleasure." This rule was followed in the case of Ex parte Castro, 115 Tex. 77, 273 S.W. 795, wherein the court held that a party marrying within a year after the divorce was granted on the ground of cruel treatment, in violation of the statute, was not void, but voidable. 35 Am.Jur. p. 181, sec. 3, states: "In view of the importance of marriage as a social institution, and the benefits accruing therefrom, it is favored by public policy and the law. It follows that a marriage will, if possible, be upheld as valid and that its validity will be presumed unless disproved. A statute will not be construed to make a marriage void unless the legislative intent to such effect is clear and unequivocal." See 1 Vernier, American Family Laws (1931) 189; State v. Yoder, 113 Minn. 503, 130 N.W. 10, L.R.A.1016C, 686, 689; Ellis v. Ellis, 152 Miss. 836, 119 So. 304; In re Estate of Gregorson, 160 Cal. 21, 116 P. 60, L.R.A.1916C, 697, Ann.Cas.1912D, 1124; Portwood v. Portwood, Tex.Civ.App., 109 S.W.2d 515, 522, col. 1; In re Guthery's Estate, 205 Mo.App. 664, 226 S.W. 626; Christensen v. Christensen, 144 Neb. 763, 14 N.W.2d 613; Wiser v. Lockwood, 42 Vt. 720; Lau v. Lau, 81 N.H. 44, 122 A. 345; Gould v. Gould, 78 Conn. 242, 61 A. 604, 2 L.R.A.,N.S., 531; Cunningham v. Cunningham, 206 N.Y. 341, 344, 99 N.E. 845, 43 L.R.A.,N.S., 355.

■ A contract of marriage by an insane person can be ratified under certain conditions by such person during his lifetime, therefore the contract is not void ab initio but only voidable. Article 4628 uses the word "void" but nowhere expressly provides the marriage of a person of unsound mind shall be void. The decisions of the several states recognize that courts, legislatures and lawyers are very loose in the use of the words "void" and "voidable" and use them interchangeably. Taking Article 4628 in its entirety, including the clause providing for the dissolution of the marriage relation, we are of the opinion the legislature intended to make such marriages voidable instead of void, and used the word "void" in that sense. Said marriage being voidable, it was not subject to collateral attack. Southern Pacific Co. v. Industrial Commission, 54 Ariz. 1, 91 P.2d 700; Kibler

v. Kibler, 180 Ark. 1152, 24 S.W.2d 867, 896, col. 2; Hood v. Hood, 206 Ark. 1057, 178 S.W.2d 670.

■ The question as to whether a marriage voidable only can be annulled after the death of one or both of the parties seems to have never reached the appellate courts of this state, but it has been held in many other jurisdictions and supported by many able textwriters that a voidable marriage is not vulnerable to direct or collateral attack after one or both are deceased. 36 Am.Jur. pp. 250–251, sec. 111; 3rd Nelson, Divorce & Annulment (1945) 281–283, #31.07; Ibid. 299–300, #31.21; 18 R.C.L. 446–77; 2 Schouler on Marriage, etc. (6th ed.) 1356–57; L.R.A.1916C, 691, col. 2; Ellis v. Ellis, 152 Miss. 836, 119 So. 304; White v. Williams, 154 Miss. 897, 124 So. 64; In re Guthery's Estate, 205 Mo. App. 664, 226 S.W. 626; Lau v. Lau, 81 N.H. 44, 122 A. 345; Hilliard v. Baldwin, 76 N.H. 142, 144, 80 A. 139, 140; In re Jansa's Estate, 169 Wis. 220, 171 N.W. 947–948.

The deceased and contestant each had been married before but each had been single for several years prior to the marriage in question and had been friends for many years. They corresponded with each other through these years and the deceased would visit the contestant at her home in Austin every few months. There is no contention on the part of the proponent that the contestant perpetrated any fraud or exerted any undue influence upon the deceased or that she overreached him in any way in bringing about such marriage. There is no evidence or contention that the contestant knew that the deceased had syphilis at the time she married him but there is evidence that she did not know it, and there is no evidence that the contestant knew his mind was affected when she married him or did not act in perfect good faith in marrying the deceased. The deceased had not been declared insane by any court prior to his marriage and the record fails to show he was ever so declared. They were duly married, lived together as husband and wife, held each other out to the world as such and were recognized as such by the public and the members of his family, including the proponent. She fully and completely performed her duties and obligations as a wife. She maintained her household with propriety, she cooked and prepared the meals not only for herself and husband but for the sick mother and brother and for the proponent when she was there, and proponent says she was there every day. Practically all of the proponent's evidence as to the insanity of the deceased at the time of said marriage is that shortly prior thereto and at the time of said marriage he was becoming forgetful. The contestant testified that the first intimation she had that the deceased's mind was affected was several months after the marriage, when she noticed that he was forgetful. The proponent recognized the marriage as being valid not only during the lifetime of the deceased but for more than two years after his death, and raised no question as to its validity until after she as administratrix filed in the county court a petition for the sale and distribution of the estate of the deceased. When the contestant filed an application for homestead and widow's allowance then the proponent says she changed her mind. The proponent, from her own testimony, was in the home of her mother and deceased practically every day after the marriage ceremony was performed and was in a position to know his mental condition, but took no action to have the marriage declared invalid during the lifetime of the deceased and waited more than two years after his mouth had been closed by death and after the contestant had in good faith performed all of her marital obligations. Marriage being the most important and sacred institution known to society, to permit her to come into court now and have the marriage set aside and held for naught for the sole reason that there will be no one contesting the instrument offered for probate, in order that she might come into possession of all of the property of the deceased to the exclusion of the contestant and his other heirs, in our opinion, would be against good morals and public policy, and we so hold.

From what we have said we do not want to be understood as holding that under no circumstances a voidable marriage cannot be set aside after the death of one or both of the contracting parties, as a situation

might arise where it would be to the best interest of society to have the marriage annulled, but we are holding that under the facts heretofore set out that this is one that should not be disturbed.

The contestant contends the court erred in overruling her motion for an instructed verdict on the ground that there was no substantial evidence in rebuttal of the presumption of revocation arising from the finding of the instrument in question with the signatures cut out; that the jury's answer to Special Issue No. 1 is supported by no evidence.

On January 13, 1930, the deceased executed his will in due form and made the proponent, one of his sisters, his sole beneficiary, stating at the time he was doing so because she had the responsibility of looking after the family, and the next day he delivered to the proponent a copy of said will. At the time of the execution of said will the deceased was not living in Moody but would come back on periodical visits. The proponent was at that time living in the town of Moody in her own home, but would make daily visits to the Neely home and look after her mother, father and afflicted brother. The father died in February, 1931, and the deceased came back and lived in the Neely home with his mother and brother up until about three weeks prior to his death, and assisted in some manner in looking after his mother and brother but the greatest part of the responsibility was assumed by proponent. She continued to go to the Neely home nearly every day but she would return to her home in Moody at night, and she also at times maintained help at the Neely home, especially during the day to assist in looking after her mother and brother. Her mother was suffering from gall-bladder trouble and was confined to her bed most of the time and continued in such condition until her death in February, 1946, but she was sound mentally.

The mother deeded to the deceased 34 acres and to the proponent 30 acres of land for the purpose of them taking care of her and paying her expenses during her lifetime. After the death of the deceased the contestant voluntarily deeded the 34 acres back to the mother as she wanted to return to Austin, where she had formerly lived.

The dates of the deeds are not shown in the record. For sometime prior to the death of the deceased, he had a small tin lock box that he kept in the vault of the First National Bank, but for how long no one seems to know. The box was similar to and one of a great number of boxes that were furnished by the bank and kept in the vault by customers of the bank and no charge was made therefor. The owner of a box had a key to it and did not have to have the bank's key in order to get into his box. A colored girl who worked at the Neely home between the time of the marriage and the deceased's death testified that at one time after the deceased married the contestant she saw the deceased with the box one morning at his home; that he was taking some papers out of the box and looking through them, and some he would put back in the box and some he threw into the waste-basket; what they were she had no idea; that he did this only for a short time and put the box under the clock in his mother's room and while the box was there he kept it in his mother's room under her bed, but there is no evidence that the will was in the box at that time. No one knows how the box came there or how long it remained nor who put the box back in the bank vault. Among the many witnesses who testified in this case for proponent, and among whom were several relatives, no other witness testified to seeing the box in the Neely home. Apparently none of the officials or employees of the bank had any knowledge of the box being removed from the vault. The only bank official testifying on this point testified that he did not have any knowledge of it being removed.

Some two weeks after the deceased died one of the bank officials called the proponent to ascertain if the deceased had left a will and she informed him about the will of 1930. He suggested to her that she come down to the bank and they would look in the deceased's lock box. The bank official and the proponent got the box and opened it with the bank's key, and in the box they found, among some abstracts and other papers, the will of 1930, but the signatures of the deceased and the subscribing witnesses had been cut out. The will had never been seen by anyone except the de-

ceased from the date it was executed and delivered to him until the box was opened on this occasion, so far as the record reveals.

■ Article 8283, Vernon's Ann.Civ. Stats., provides:

"Every last will and testament except where otherwise provided by law, shall be in writing and signed by the testator or by some other person by his direction and in his presence, and shall, if not wholly in the handwriting of the testator, be attested by two or more credible witnesses above the age of fourteen years, subscribing their names thereto in their own handwriting in the presence of the testator."

Article 8285 provides:

"No will in writing, made in conformity with the preceding articles, nor any clause thereof or devise therein, shall be revoked, except by a subsequent will, codicil or declaration in writing, executed with like formalities, or by the testator destroying, cancelling or obliterating the same, or causing it to be done in his presence."

57 Am.Jur., p. 378, sec. 550, states that "it is generally agreed that if a will offered for probate which is shown to have been in the possession of the testator when last seen after its execution, was found among the testator's effects after his death, in such a state of mutilation, obliteration, or cancellation as represents a sufficient act of revocation within the meaning of the applicable statute, it will be presumed, in the absence of evidence to the contrary, that such act was performed by the testator with the intention of revoking the instrument." See 165 A.L.R. p. 1202; 40 Cyc. 1280; 2 Page on Wills, p. 1318, sec. 774. The same rule applies where the will is lost and cannot be produced. Davis v. Roach, Tex.Civ.App., 138 S.W.2d 268, 269, 270; Clover v. Clover, Tex.Civ.App., 224 S.W. 916; Aschenbeck v. Aschenbeck, Tex. Civ.App., 62 S.W.2d 326; Shepherd v. Stearns, Tex.Civ.App., 45 S.W.2d 246; Bailey v. Bailey, Tex.Civ.App., 171 S.W.2d 162; Whitefield v. Whitefield, Tex.Civ. App., 140 S.W.2d 347.

Proponent says this rule does not apply to the facts before us for the reason that other persons could have gone into the bank vault and cut the signatures out of the instrument, or the same could have been performed while the box was at the home of the testator. The evidence shows that the deceased went in February, 1943, to Dallas and was there for two or three weeks and during that time the contestant lived at the home a part of such time, but there was no evidence that the box was at the home at any time during such period and there is no evidence that any person ever saw the will after it was executed and delivered during the lifetime of the deceased. The box containing the will was found locked and in the vault of the bank with other private papers of the deceased and there is no evidence that anyone ever touched the box except the deceased. The box while at the bank was kept in a vault and the deceased and other customers of the bank who had lock boxes had access to the vault. Proponent testified that she moved back to the Neely home on April 1, 1943, and several weeks after the death of the deceased she found three keys on a string in a washstand drawer which was situated in the bathroom of the Neely home; that there was only one bathroom in the house and it was used by the whole family; that the deceased's room or apartment was located near the bathroom with an entrance thereto; that one of the keys would lock and unlock the bank box; but there is no evidence as to who put the keys there or that any other person ever saw the keys or knew they were there during the lifetime of the deceased. On the same day and after the burial of the deceased the contestant left the Neely home and went to Austin and did not return for several weeks thereafter, and then upon occasional visits.

■ The evidence showing that the will of the deceased was in his possession when last seen, and when found it was in his lock box among his other private papers that he had access to, and there being no evidence that anyone else ever saw or touched the same from the time of its execution until after his death and when it was found it was in a cancelled condition, creates a presumption that the act of cancellation was done by the deceased with the intention of revoking it, and casts the burden upon the proponent to overcome

such presumption by clear and satisfactory proof. As said in Davis v. Roach, Tex.Civ. App., 138 S.W.2d 268, 270:

"But proponent contends that the presumption of revocation from the facts of disappearance of the will and the possession or control thereover by the testator does not arise or is rebutted in the instant case because the evidence showed that the will was in the possession of a person other than the testator prior to his death. This contention is predicated upon the facts that testator left the will in his locked box in the vault of the bank and left a key thereto with Tippen at the time he was in charge of the bank. This contention assumes, contrary to the evidence, that the will was last in the possession of Tippen, or later the receiver. The will was in the locked box of the testator, which was deposited in the vault of the bank used by its customers for that purpose, and all testator had to do to get actual physical possession of the box containing the will was to ask Tippen or any employe of the bank for it. No one was authorized or shown to have taken the will from the locked box of testator, or to have had any opportunity to have done so. He alone had control of and access to it under the evidence adduced. These facts bring the case clearly within the rule that the presumption that testator revoked his will arises when it was in his possession or 'accessible' to him and cannot be found after his death. This rule of accessibility to the will by testator has been approved by the Texas courts in the application of presumption of revocation doctrine."

In Bailey v. Bailey, Tex.Civ.App., 171 S.W.2d 162, the court said:

"Where a will when last seen is in testator's possession or in a place to which he had ready access, but after his death will cannot be found, the presumption arises that testator destroyed the will in his lifetime with the intention of revoking it. The presumption that testator has revoked an unproduced will last seen in his possession stands in place of positive proof that the will was revoked. * * * To overcome [such presumption] evidence of a clear and convincing nature is required to be produced."

To presume that some person other than the deceased cut the signatures from the will would be doing so without evidence, and would be basing a presumption upon a presumption. It would be a presumption of fraud on the part of some person rather than a presumption of innocence. Bob's Candy & Pecan Co. v. McConnell, 140 Tex. 331, 167 S.W.2d 511, 514; Texas & N. O. Ry. Co. v. Brannen, 140 Tex. 52, 166 S.W.2d 112; Whitefield v. Whitefield, Tex.Civ.App., 140 S.W.2d 347.

Proponent argues that if the deceased did perform the act of cancellation, the evidence showing that the deceased was sane part of the time and insane part of the time after the execution of the will, the burden of proof was upon the contestant to prove the act was done while the deceased was sane. The will was executed January 13, 1930, and the proponent does not contend that his mind began to fail until the fall of 1941, more than ten years later, and cites Sprigge v. Sprigge, English Law Reports, Vol. 1, p. 608, a decision by a judge of the Court of Probate and Divorce of England; but we do not think this is the rule in Texas as the point has been decided adversely to such contention in McIntosh v. Moore, 22 Tex.Civ.App. 22, 53 S.W. 611. See also, In re Sharp's Will, 134 Misc. 405, 235 N.Y.S. 692. Another reason why proponent's position is untenable is that the case was tried principally upon the theory that some person other than the deceased cut the signatures from the will. The case was submitted to the jury upon this theory and the jury so found, and proponent made no objection to the charge as to substance, manner or form, thereby waiving the same.

Contestant raises other points of error, which will not be passed upon for the reason that the case appears to have been fully developed upon the theory it was tried and submitted, some twenty-odd witnesses testifying for the proponent.

Being of the opinion that proponent failed to meet the burden placed

314

upon her to overcome the presumption that the deceased did cut the signatures from the will with the intention of revoking the same, the cause is hereby reversed and rendered.