BESSIE WILSON, CHARLOTTE LOUISE HOWARD, CORA M. B. JACKSON, EDGAR L. BRUSSMAN AND CLARENCE J. BRUSSMAN, PLAINTIFFS (RESPONDENTS), v. EUGENE JOSEPH CAULFIELD, ALIAS BERT J. FRANCIS, DEFENDANT (APPELLANT).—67 S. W. (2d) 761.

St. Louis Court of Appeals. Opinion filed February 6, 1934.

Motion for rehearing overruled February 21, 1934.

Certiorari denied by Supreme Court April 18, 1934.

*Cobbs & Logan* and *Frank H. Haskins* for appellant.

*Foristel, Mudd, Blair & Habenicht* for respondents.

1212

McCULLEN, J.—This is an action in equity brought by respondents, who were plaintiffs below, to set aside a decree of the Juvenile Court of the City of St. Louis, Missouri, approving the adoption of appellant (defendant) by Nettie R. Francis, now deceased. A trial resulted in a finding and decree for defendant. Plaintiffs filed a motion for a new trial, which was sustained by the court. From the order granting a new trial defendant appeals.

The petition of plaintiffs alleged that they are the sisters, brothers and father of Nettie R. Francis, who died in the City of St. Louis, on September 5, 1930, possessed of a large amount of real and personal property and leaving no valid will disposing of the same; that plaintiffs, as next of kin and heirs at law of the said Nettie R. Francis, deceased, are entitled to share in the distribution of her estate.

Plaintiffs alleged that on or about the 25th of July, 1930, when the said Nettie R. Francis was aged, weak, infirm and in her last illness, with death impending, and when her mind was weakened and unbalanced, defendant, who was in nowise related to her, in conjunction with Oreon E. Scott, who was real estate agent and confidential advisor to said Nettie R. Francis, procured from her an affidavit wherein there was no mention that it was to be attached to a petition for adoption; that said affidavit was thereafter attached to a separate page constituting a petition for adoption and filed in the juvenile court on the 2nd of September, 1930, in furtherance of defendant's scheme to have himself declared an adopted child of said Nettie R. Francis, for the purpose of trying to get for himself the total of her estate.

The petition further alleged that defendant and Oreon E. Scott, by persuasion, coercion, force, request, coaxing, suggestion, annoyance, interference and dictation practiced by them upon said Nettie R. Francis, caused her to sign said application for the adoption of defendant when she did not desire to do so of her own free will, but

that she was caused to do so by their undue influence and domination whereby her mind was overpowered and their will and desire substituted in place of her own.

Plaintiffs alleged that defendant, in conjunction with said Oreon E. Scott, caused and procured a hearing in the Juvenile Division of the Circuit Court of the City of St. Louis, Missouri, upon said petition for adoption, and that said court rendered a judgment and decree on the 5th of September, 1930, approving the adoption of defendant and changing his name from Eugene Joseph Caulfield to Bert J. Francis.

The petition further alleged that defendant and said Oreon E. Scott, acting in concert, by fraud, deceit, undue influence and coercion, induced said Nettie R. Francis to sign said application for adoption, and that without her knowledge, approval or consent they caused it to be heard by the juvenile court on September 5, 1930, while she lay at the point of death, and that on said day, within a few hours after the court rendered its judgment and decree, the said Nettie R. Francis died.

Plaintiffs further averred that all matters as to the domination and undue influence of defendant and said Oreon E. Scott over said Nettie R. Francis, her mental and physical condition, the imminence of death, the fact that she was then dying, the substitution of the will and desire of defendant and said Oreon E. Scott in place of the will and desire of said Nettie R. Francis were kept hidden from the knowledge of the court, and the court not knowing of said conditions, was induced through said fraud and deceit to give its approval to the purported adoption.

After the cause was tried and taken as submitted, plaintiffs amended their petition by alleging that defendant was an adult, twenty-four years old, and that the adoption of defendant was without consideration and not within the jurisdiction of the juvenile court.

There was a prayer that the decree and judgment of the juvenile court be set aside and declared null and void.

Defendant filed a demurrer on the ground that the petition "does not state facts sufficient to constitute a cause of action." The demurrer was overruled, whereupon defendant filed a general denial as his answer.

At the trial, the death of August F. Brussman, father of Nettie R. Francis, one of the plaintiffs, was suggested, and his name was stricken from the petition.

The contention of plaintiffs that the juvenile court was without jurisdiction to enter a decree of adoption because defendant was an adult, is now without merit in this court. Our Supreme Court, in State ex rel. Buerk v. Calhoun, 330 Mo. 1172, 52 S. W. (2d) 742, which was decided after the case at bar was decided below, directly

held that an adult person may be adopted as the child of another under Missouri statutes.

Counsel for defendant contend that under the pleadings and evidence plaintiffs have no right to attack the decree of adoption because a voidable adoption, like a voidable marriage, can be set aside only in a suit brought by persons having a vested interest at the time of the adoption, or marriage.

The courts of this State have not directly passed upon the question involved here, but counsel for defendant cite two Missouri cases holding that collateral heirs and next of kin of a deceased spouse have no standing in court to attack a voidable contract of marriage, and we are urged to apply that rule to the case at bar.

The first case cited, Henderson v. Henderson, 265 Mo. 718, 178 S. W. 175, was a suit brought by collateral heirs and next of kin to set aside a marriage on the ground of the mental incapacity of the deceased ancestor. The court held that the marriage was not absolutely void, but merely voidable, under a statute of Arkansas, where the contract of marriage was made, and could only be attacked during the lifetime of both spouses.

The second Missouri decision relied on by defendant, In re Guthery's Estate, 205 Mo. App. 664, 226 S. W. 626, was a suit in which the right of a widow to act as administratrix of the estate of her deceased husband was disputed by a collateral heir and next of kin of the deceased on the ground that at the time of the marriage the deceased was on his death bed and mentally incompetent to understand the nature of the marriage ceremony. The court held that in view of the statutes, Revised Statutes of Missouri, 1909, Sections 8279-8281, marriage with a person of unsound mind was voidable and not void; that such a marriage could only be inquired into by one of the parties during the lives of both of them, and unless it was set aside during such lives it became a valid marriage.

Neither of the two cases discloses any reference to or discussion of the right of collateral heirs or next of kin to bring a suit to set aside an adoption on the ground of fraud in the procurement thereof. There are features in the status created by marriage and that created by adoption which may be said to be similar. For instance, they are both civil contracts in which the State has an interest, but there are reasons based on public welfare and morality which prompt courts to deny the right of collateral heirs of a deceased spouse to set aside a marriage contract after the death of such spouse that do not apply in determining the right of collateral heirs of a deceased adopting parent to set aside an adoption alleged to have been procured by an adult by wrongful and fraudulent means. The distinction between the two kinds of cases may be readily perceived when we consider the possibilities of harm and injustice which might be done to innocent offspring should there be any relaxation of the

vigilance and care exercised by the courts under the law to protect and preserve the sanctity of the marriage relation, whereas, no such harmful possibilities can arise from a recognition of the right of collateral heirs to sue to set aside the adoption of an adult on the ground of fraud in the procurement thereof.

The status created by marriage and that created by the adoption of an adult are not of such an analogous nature as to require us, to follow in this adoption case the rule which was applied in the Missouri cases dealing with marriage.

Elsewhere, courts have passed directly on this question. Courts of a number of states have held that collateral heirs having no vested interest at the time of an adoption cannot attack the decree of adoption, while courts of other states have held that the next of kin of the deceased adopting parent are authorized by law to bring an action to set aside an adoption alleged to have been wrongfully and fraudulently procured.

Cases from the first mentioned group of states are cited by counsel for defendant, who earnestly urge that we apply to this case the rule therein laid down. After careful consideration we have concluded not to follow those cases because we believe those holding to the contrary are based upon sounder reasoning.

Tucker et al. v. Fisk, 154 Mass. 574, 28 N. E. 1051, was a proceeding to revoke a decree of adoption alleged to have been procured by means of fraud and undue influence, and was brought by the heirs at law and next of kin of Eliza Jane Fisk after her death. It was contended in that case, as it is in the case at bar, that the petitioners had no standing in court and no right to be heard. Answering this contention, the court said:

"If they cannot now be heard there would seem to be no way in which the adoption proceedings, however fraudulent, can be reached; and the death of Eliza will have operated to clothe the defendant's fraud with immunity from attack. We do not think her death can have that result. But for the alleged adoption, the petitioners, who were the next of kin of Eliza, would have been her heirs at law. If the adoption proceedings should turn out for any reason to be invalid, they will be entitled to her estate as her heirs at law. They have, therefore, a direct pecuniary interest in the matter like disinherited heirs in proceedings concerning their ancestor's will, or heirs whose ancestor was fraudulently induced to make a conveyance of real estate." [Tucker et al. v. Fisk, supra.]

Phillips et al. v. Chase, 203 Mass. 556, 89 N. E. 1049, was a suit in which a decree of adoption by a wife of her husband's child by a former marriage was set aside because of undue influence exerted by the husband, and was brought by the wife's heirs against the husband after the death of both the wife and the child. The court said:

"But the peculiarity of the case at bar and of the case before the court in Tucker v. Fisk, 154 Mass. 574, 28 N. E. 1051, is and was that the decree which entitled the respondent disentitled the petitioners. . . . If the adoption of Woodruff as Mrs. Chase's son is not set aside the petitioners are not entitled to her property as her next of kin. Under those circumstances no relief can be given unless the decree of adoption is set aside. If a decree of adoption is ever to be set aside to prevent a person taking or keeping property obtained through her own fraud it can be properly done when (as in the case at bar) the adoption was originally made not for the personal relations thereby created but for its effect upon property, where both parties to it are dead, and where the only person entitled to property by force of it is the person who committed the fraud." [Phillips v. Chase, supra; see, also, Raymond et al. v. Cooke, 226 Mass. 326, 115 N. E. 423; Stevens v. Halstead, 168 N. Y. Supp. 142; Green v. Fitzpatrick, 220 Ky. 590, 295 S. W. 896.]

The charges in the case at bar constitute a direct attack upon the adoption on the ground that undue influence and fraud were committed by defendant in the very procurement of the decree of adoption. It is true the evidence shows that Nettie R. Francis, in 1930, made a will and therein named defendant as the main beneficiary, cutting out the interest of plaintiffs in her estate, but the evidence also shows that a suit is pending contesting that will. It, therefore, has ceased to be a will and has become a mere scroll, or writing, "until such time as it is proved anew in the contest proceeding." [State ex rel. v. Imel, 243 Mo. 180, 147 S. W. 989.]

No rights of children are involved in this case, and in the absence of the adoption plaintiffs would be entitled, under the law, to their respective shares in the distribution of the estate of Nettie R. Francis. Plaintiffs, therefore, have a direct pecuniary interest in her estate, which interest, it is charged, defendant has, by undue influence and fraud, interfered with to their loss. If it be true, which, of course, we do not undertake to determine at this time, that defendant exerted undue influence and practiced fraud in the procurement of his own adoption, whereby he entitled himself and disentitled plaintiffs to the property of the deceased, a holding by this court that plaintiffs have no right or standing to bring this suit would permit defendant to profit by his own fraud, for the reason, that if plaintiffs have no right to bring this suit, no one else has such right.

We are not in favor of adopting a rule of law which would prevent an inquiry by a court of equity into charges of undue influence and fraud in this kind of a case. While it is true the general policy of the law is to discourage litigation, nevertheless, that policy should not be extended to the point where it would close the door of the temple of justice against parties who have a direct in-

terest in an estate which the charge has been adversely affected by the fraud of another party.

We hold that plaintiffs are proper parties to bring this suit.

The chancellor's action in granting a new trial on the ground that he erred in his findings that the purported petition for adoption and purported adoption were not the result of undue influence practiced upon Nettie R. Francis by defendant and the other two persons named, was equivalent to a declaration that his findings were against the weight of the evidence.

Counsel for defendant earnestly insist that the original decree in favor of defendant is the only one which can be justified by the evidence in the case. It is contended that this court should review the entire record and render such final decree as in equity and good conscience should have been rendered by the chancellor. A number of cases are cited to support this contention, but they are all cases dealing with appeals from final decrees. Such cases have no application here, in view of what our Supreme Court has said on this very question.

In a suit in equity an appeal was taken from an order granting a new trial. The Supreme Court was asked, as we are asked in the case at bar, to try the case *de novo* and to give such judgment as justice and equity required. The court said:

"The only questions that can be considered on this appeal are those germane to the inquiry, whether the lower court properly granted a new trial. . . . To weigh the evidence and pass on its effect at this stage of the proceeding would be to decide the case on its merits without any judgment having been rendered thereon in the court of first instance. . . . It is true, . . . that an appeal in equity from a final decree rendered on an issue of fact brings up the whole case for trial anew in the appellate court. But this is not an appeal from a final decree. . . . And an appellate court is without authority to make findings of its own on an issue of fact in an equity case such as this, except as an incident to its review of the findings and judgment of a court having original jurisdiction." [Fishback v. Prock (Mo.), 242 S. W. 962; see, also, Pressy v. Slezak (Mo.), 278 S. W. 382, 386.]

The appeal in the case at bar is not an appeal from a final decree. The trial judge has not yet reached a final decision on the facts.

In an equity suit brought to set aside a deed on the ground that the defendant obtained the deed by fraud and undue influence, our Supreme Court said:

"The evidence on the issues of fact was conflicting and it was the right and duty of the chancellor to set aside his findings and his judgment or decree based thereon, if, on a reconsideration and further reflection he was satisfied that his first conclusions were wrong." [Hurley v. Kennally, 186 Mo. 225, 228, 85 S. W. 357.]

In the situation of the case now before us, the trial court not having reached a final decision, and there being no final decree, this court is not authorized to review the evidence for the purpose of determining what the final decree should be. Furthermore, this court will not interfere with the trial court's exercise of its discretionary power to grant one new trial on the weight of the evidence unless it appears that the court abused its discretion.

In King v. Mann, 315 Mo. 318, 286 S. W. 100, our Supreme Court said:

"Furthermore, the trial court has the right to grant to either party one new trial, in either a law or equity case, if it is satisfied that the verdict or finding is against the weight of the evidence. . . . Such power is exclusively discretionary in the trial court and will not be interfered with on appeal, at least in the absence of an abuse of discretion." [See, also, Riche v. St. Joseph, 326 Mo. 691, 695, 32 S. W. (2d) 578.]

A brief review of the evidence is, therefore, necessary, not for the purpose of determining its weight, and not for the purpose of passing upon the merits of the case, but solely to enable us to determine whether the trial court did, or did not, abuse its discretion by granting a new trial.

The evidence disclosed that Nettie R. Francis was the widow of Albert J. Francis, who died in 1924, leaving her one-half of his large estate. They had been married in 1896, but never had a child of their own. In 1909 they took defendant into their home. Defendant was then three years old. His father was Dr. Eugene A. Caulfield. His mother had died when he was two years old. After being taken into the Francis home, defendant was called Bert Francis. For brevity, Nettie R. Francis and her deceased husband will be referred to as Mrs. Francis and Mr. Francis respectively. Mr. and Mrs. Francis treated defendant as though he was their own child, supported him, sent him to the St. Louis public schools, and later to Wentworth Military Academy at Lexington, Missouri.

James Harold Poole testified that he married Mrs. Francis' niece on June 27, 1923, at which time the niece was living with Mrs. Francis. From 1925 until the time of the death of Mrs. Francis he visited her home. He testified that when defendant was in a good humor everything was fine, but if he wanted money from Mrs. Francis he was ill-tempered and called her names. The witness said that on various occasions Mrs. Francis talked with him about defendant; that she would go into hysterics more or less and cry and would go to her room, then come back smiling and request that nothing be said about her actions or what she had said to anyone; that in conversations on the subject of adoption of defendant, Mrs. Francis said she never would adopt him; that she had never done so up to that time and declared that if she kept her right mind she

never would; that she was afraid of defendant's "background" and what might develop later in life, giving as her reasons that she knew defendant's father, knew his characteristics and habits and what had taken place in his life and didn't care to adopt defendant as her son and make him her legal child. The witness was asked specifically:

"Q. Did she tell you what she understood had happened with reference to Bert's father?"

He answered:

"A. That he had killed his father."

The witness said Mrs. Francis told him that she did not know of this matter before taking defendant into her home. He testified that these conversations with Mrs. Francis occurred every two or three months, or occasionally over three or four years, and that the last time he talked with her on the subject was in June, 1930, the year in which she died.

This witness also testified to conversations which he had with defendant during July, 1930, concerning defendant's relationship with Mrs. Francis on the question of adoption; that defendant said Mrs. Francis was not giving him any money at that time; that defendant never seemed to have much money, but told the witness he was going to make a trip and see the whole world; that the witness laughed and asked defendant where he would get the money to take a trip, saying to him: "It looks queer to me that you could take this trip and just a few days ago you were so poor;" that defendant said: "Well, I will tell you. I brought the old lady around and I have everything my way now." That defendant further said:

"I went down and talked the matter over with Mr. Scott (referring to Oreon E. Scott) and we got down to facts the way in which we could force the old lady to adopt me and make me the legal beneficiary of her estate."

The witness further testified that defendant told him that after he came back from talking with Mr. Scott, defendant and his wife prepared to leave for Lebanon, Illinois, and that Mrs. Francis, who was ill at the time, asked if they were leaving for good, and defendant told her they were; that she could get other people to look after her; that there was no reason for him to stay when she was not giving him any spending money; that Mrs. Francis then begged him to stay, saying she was sorry for what had happened; that she would consult Mr. Scott and get some legal advice on the matter; that defendant said he told Mrs. Francis:

"If you feel that way we will go over there for a few days and give you time to see Mr. Scott or take what action you see fit and then we will come back and we expect you to have everything in readiness when we get back."

The witness further testified that defendant told him that Mrs. Francis said she wanted more time; that this was too serious a matter

to consider without due consideration, and that defendant told her there was only one condition under which he would give her more time, and if she didn't comply with that he would take his family and leave the house for good, and that condition was that she would give him a check for $5,000, and that he would hold the check, and that he would give her a few more days to decide, and then if she didn't adopt him he would have the $5,000.

The witness said that later on defendant told him that "everything was all right and they had fixed everything up and they had gotten the papers through and that he was legally adopted or would be in the near future."

With respect to the mental condition of Mrs. Francis in 1930, up until the time of her death, this witness testified as follows:

"Q. You had conversations with her and talked about various subjects and observed her actions? A. Yes.

"Q. In your opinion, just how did you consider her mentally, weak or infirm or what? A. She was in such a nervous state, according to my judgment, she was more or less imcompetent. Her nervousness indicated to me that she was rather erratic.

"Q. Could she talk on any subject with reference to Bert, or any other subject, without becoming nervous? A. No, sir. She would be very excitable—very excitable."

Mrs. Esther B. Poole, niece of Mrs. Francis, testified that she began living in the home of Mrs. Francis in 1917, and stayed there until she was married in June, 1923; that defendant was considered one of the family at that time, but was not at home all the time, being away at school, and when he was not away at school, Mrs. Francis would send him to the home of her sister, Mrs. Bessie Wilson, for vacation. She testified that Mrs. Francis frequently talked to her about defendant, who was referred to as "Bert;" that Mrs. Francis would go into hysterics a good many times, would cry and say:

"I don't know what I am going to do with Bert. He has not turned out the way I expected him to. My life and soul were with him, but since I have learned that Bert's father actually killed his own father, and that he has treated me so rude and was so indifferent toward me, I don't know what I will do with him."

The witness further testified:

"Q. Did she ever tell you that Bert wanted her to adopt him during the latter part of her life? A. She told me he had asked her to adopt him.

"Q. Did she say anything as to whether she would? A. She said she wasn't going to adopt him."

Mrs. Charlotte Louise Howard, a sister of Mrs. Francis, testified that in March, 1930, Mrs. Francis spent the night at her home; that they slept together, and Mrs. Francis, referring to defendant, said:

"Lottie, he is hounding me to death and wants me to adopt him. I am not going to."

In June, 1927, Mrs. Francis executed a will in which she made provision for a trust fund from which an annual income for life was to be paid to defendant, and upon the termination of the trust, $50,000 was to be paid to each surviving child of defendant. In this will Mrs. Francis provided that her father should receive $3,000 if he survived her. She also made provision in this will for substantial incomes to be paid from a trust fund to her brothers and sisters.

In the will which was executed by Mrs. Francis in July, 1930, at the same time she signed the petition for adoption, she made no provision for anything to go to her father, or to any of her relatives. There was testimony to the effect that after Mrs. Francis signed the adoption paper she told Oreon E. Scott to get it back; that she did not want to go through with the adoption, and that Scott told her he had destroyed the paper, but had not actually done so.

In the latter part of May, 1930, Mrs. Francis, who had been on a visit to Chicago, Illinois, returned to St. Louis and made a visit to her father at Leesburg, Missouri, where her sister Mrs. Bessie Wilson lived. Mrs. Francis herself was ill at that time, and early in June, 1930, she returned to her home in St. Louis, where she remained until the time of her death on September 5, 1930.

There was evidence to the effect that in July, 1930, while she was ill at her home, Mrs. Francis requested defendant and Oreon E. Scott to go to her safe deposit box to attend to some personal matters for her, and that while they were there, they read the will Mrs. Francis had executed in 1927.

On July 15, 1930, Mr. Scott took Mr. Frank Haskins, a lawyer, to the home of Mrs. Francis, where the three discussed the making of a new will by Mrs. Francis. Defendant was not present at this conference. Mr. Scott testified that it was at the request of Mrs. Francis that he took Mr. Haskins to her home.

Mr. Haskins testified that Mrs. Francis requested him not only to prepare a will for her, notes for which he took down during the conference, but that she also told him to prepare the necessary papers for her to adopt defendant. The will and petition for adoption were prepared by Mr. Haskins and taken to the home of Mrs. Francis on July 25, 1930, where she signed them. Mr. Haskins had also prepared an appearance and consent in the adoption matter, which he left with Mrs. Francis to be signed by defendant.

On August 25, 1930, Mrs. Francis' condition was such that a nurse was employed, who stayed with her at night.

The paper containing the consent and appearance of defendant to the adoption proceedings was signed by defendant on August 28, 1930, at Mr. Haskins' office. The petition for adoption and appearance and

consent of defendant were filed by Mr. Haskins in the juvenile court September 2, 1930. Mr. Haskins testified that he arranged with the judge of the juvenile court to hear the matter specially on Friday, September 5, 1930, and that he told the judge that Mrs. Francis was very ill, that she was likely to die at any time, and that she wanted to complete the adoption of defendant before her death. A note signed by Dr. David M. Gibson, and addressed to the judge of the juvenile court, was introduced in evidence. It contained the following:

"This is to certify that Mrs. A. J. Francis, of 5374 Delmar Avenue, is sick, confined to bed and unable to appear in court.

"Respectfully submitted,

"D. M. GIBSON, M. D."

The note was not sworn to, nor did Dr. Gibson appear as a witness at the adoption hearing. The note was presented to the judge of the juvenile court and the hearing was held at 10:30 o'clock on the morning of September 5, 1930. Those who appeared before the judge in the adoption hearing were Mr. Haskins, Mr. Scott and the defendant herein. The decree approving the adoption followed immediately after the hearing, and Mr. Haskins received a copy thereof at about eleven o'clock the same morning.

During the direct examination of Mr. Haskins, who was called as a witness for plaintiffs, he was asked whether anything was disclosed to the judge of the juvenile court during the hearing as to the actions of Mr. Scott and defendant concerning their coercion or persuasion of Mrs. Francis in this matter, as related by witnesses during the trial of the case at bar. He answered:

"There was nothing said at that time, nor did I ever hear anything about coercion or persuasion until your petition was filed."

In this connection he further testified in answer to questions by counsel for plaintiffs:

"Q. So the court had no information on these lines if anything like that existed? A. If anything like that existed the court had no knowledge of it.

"Q. And you were not advised of anything on that? A. Not until the petition was filed or perhaps you might have mentioned it to me a few days beforehand."

The decree of adoption entered by the juvenile court recites:

"Now at this day this matter coming on for hearing comes the petitioner, Nettie R. Francis, in her own proper person and by attorney. . . ."

This recital is contrary to the fact for it is admitted by all parties that Mrs. Francis, at the time of the adoption hearing in the juvenile court, was at home in her last illness and died on the evening of the same day that the decree was entered.

Plaintiffs introduced testimony to the effect that defendant was

abusive to Mrs. Francis; that he threatened her; that she was afraid of him and was afraid to be alone in the house with him and sent for servants to stay with her for protection, and that on the other hand she was fond of her sisters, and of her father. There was also testimony that she had stated, almost up to the time of her death, that she had made provision for her father and her sister, Mrs. Bessie Wilson, as well as for others.

Considerable other testimony was introduced by plaintiffs tending to prove their contention that the failure on the part of both Mr. and Mrs. Francis to adopt defendant throughout the long period of years from the time they took him at the age of three years, was due to a definite and decided purpose on their part not to do so because of their disappointment in him and their fear of characteristics which he exhibited which they attributed to what they termed his "background."

On the other hand, the testimony of defendant was in direct conflict with the testimony of plaintiffs and tended to prove that both Mr. and Mrs. Francis were very fond of defendant; that they loved him as they would have loved a child of their own, and the reason he was not adopted by them was that at the time they took him into their home, his natural father would not consent to an adoption unless he should be permitted to have a right to visit the child from time to time; that the reason Mrs. Francis did not adopt the defendant after the death of her husband, Mr. Francis, in 1924, was due to mere procrastination on her part.

There was testimony on behalf of defendant to the effect that Mrs. Francis was a woman of strong, clear, sound and unimpaired mind up to the time of her death.

There also was testimony to show that the attitude of defendant toward Mr. and Mrs. Francis was at all times proper and displayed affection on his part for both of them.

The charge in the petition concerning the procurement of an affidavit in which no mention was made of adoption, and which was alleged to have been thereafter attached to a separate petition for adoption, with without any support in the evidence.

There was much testimony on both sides which, because of the length of this opinion, we have not even attempted to mention. Plaintiffs expressly waived the incompetency of defendant to testify resulting from Mrs. Francis' death, while on the other hand defendant permitted hearsay evidence to be introduced by plaintiff without objection. Practically all of the evidence on the contested points consisted of testimony by witnesses at the trial who were more or less interested in the outcome of the case.

The credibility of the witnesses and the determination of the weight to be given to their testimony is supremely important in this case. The chancellor who sat in the trial, who heard all the testimony, who

saw the witnesses and observed their demeanor on the witness stand was in a far better position than this court can possibly be to weigh the evidence. He has declared, by his action in granting a new trial, that he was not satisfied with the conclusion he reached and that the case should be reheard in its entirety.

It clearly appears that there was substantial evidence presented by both sides, and in view of the conflicts therein with respect to material and important matters, we are unable to see wherein the chancellor has abused his discretionary power by granting a new trial. A new trial will afford all interested parties an opportunity to have a full hearing upon the whole case and will enable the trial court to reach a final decision. The conclusion which we have reached makes it unnecessary for us to pass upon other points discussed in the briefs.

The order granting a new trial is affirmed and the cause remanded so that such new trial may be had. *Becker, J.,* concurs; *Hostetter, P. J.,* not sitting.