[Civ. No. 8225. Fourth Dist., Div. One. May 12, 1966.]

Adoption of ELEANOR PUTNAM SEWALL, an Adult. ELLEN KEELER SCHAEFER et al., Plaintiffs and Appellants, v. ELEANOR PUTNAM SEWALL, Defendant and Respondent.

Jacobs, Jacobs, Nelson & Witmer, M. Lyle Nelson and Michael F. Dillon for Plaintiffs and Appellants.

Rutan & Tucker, John W. Solomon, Garvin F. Shallenberger, John B. Hurlbut, Jr., and Leroy M. Gire for Defendant and Respondent.

WHELAN, J.—Leila Love Keeler (Leila) and Ellen Keeler Schaefer (Ellen) pursue separate appeals from several judgments denying their respective petitions to set aside a decree of adoption entered by the Superior Court in Orange County.

The adoption decree, entered June 11, 1952, approved an agreement, dated May 13, 1952, by which Charles Butler Keeler (Charles), then 72 years of age, assumed the relationship of parent to Eleanor Putnam Sewall (Eleanor), then 45 years of age, who reciprocally assumed toward Charles the relationship of child. Eleanor was a widow, who was living with her mother, and had two daughers, one married.

Ellen, the only blood relative of Charles surviving, is the child of his deceased brother.

Leila, then aged 39, married Charles on September 19, 1919. They had no children. In 1943 Charles obtained a Nevada divorce from Leila. Neither of them remarried.

Charles died on January 19, 1964, leaving an estate of $94,738.23. His last will, executed on June 5, 1952, was presented for probate by Eleanor, named therein as executrix and sole beneficiary. Probate of the will is being contested by Ellen. Pending trial of the contest, Eleanor was appointed special administratrix on February 14, 1964.

In addition to an estate subject to probate in California, Charles was a life tenant of intervivos and testamentary trusts created by his mother Ellen C. Keeler who died March 19, 1943. His brother also had been a beneficiary of the trusts, which provided that upon the death of a life tenant one-half of the corpus should go to "his direct heirs."

On February 27, 1964, Ellen filed in the adoption proceeding a petition to set aside the decree of adoption, to which a demurrer was sustained with leave to amend. On April 10, 1964, a second amended petition was filed in four counts. The

first cause of action alleged fraud and undue influence practiced upon Charles by Eleanor in the procurement and execution of the adoption agreement; that Charles was then in poor health, mentally ill and physically ill and debilitated, and suffered from a variety of progressive mental and physical illnesses, including but not limited to chronic brain syndrome, senile psychosis and gross mental confusion; that these conditions continued until the time of his death; that he was susceptible to undue influence and fraudulent promises because of said physical and mental condition; that Eleanor falsely represented to him that she would care for and look after him as a daughter and give him the necessary care that a loving daughter would give a parent; that she knowingly did not intend to fulfill such duties or to regard him with love and affection; that at no time from June 11, 1952, to the date of his death on January 19, 1964, did Eleanor live with Charles or have him live with her, nor did she care for him, nor did she see that he had proper food and care; that at no time did Eleanor fulfill her obligations as a daughter to Charles; that said representations were knowingly made to induce Charles, in reliance thereon, to enter into the adoption agreement; that Charles was of such a state of mind as easily to be duped by artful and designing persons, including Eleanor, and he therefore justifiably relied upon and believed said representations to be true, and in such reliance agreed to said adoption; that in bringing about the adoption, Eleanor did so not to fulfill a domestic or family gap or to perform her duties and obligations as a daughter, whereby she would care for and regard Charles with the love and affection of a daughter for a parent, but solely for financial gain; that because of Charles' mental and physical illness he was unable to and did not during his lifetime discover the falsity of the promises made to him by Eleanor which had induced him to enter into the adoption agreement; and that Eleanor concealed the fact of the adoption from Ellen and from all of the friends of Charles until after his death. The petition alleged also the execution of the will; the fact that Eleanor was seeking to have it admitted to probate; her appointment as special administratrix; the creation of the trusts by the mother of Charles, and Ellen's position with regard to them if she, rather than Eleanor, were the direct heir of Charles.

The second cause of action incorporated all the allegations of the first and alleged that in obtaining the adoption decree there was fraudulent concealment from the court by Eleanor

of her fraud practiced upon Charles and of the facts concerning his physical and mental condition.

The third cause of action alleged that Leila was the lawful wife of Charles at all times from their marriage until his death; that they were not legally separated; that Leila was capable of giving consent to the adoption, but that she did not consent and would not have consented had she known of the adoption proceedings; that she did not know of the proposed adoption until after the death of Charles; that the adoption proceedings were surreptitiously entered upon; that Leila did not have any kind of notice thereof, although Charles knew her place of residence at all times.

The fourth cause of action alleged fraud upon the court by both Charles and Eleanor in alleging that Charles was unmarried and in concealing from the court the truth as to his married status.

A demurrer was overruled as to the third and fourth alleged causes of action; sustained without leave to amend as to the first and second alleged causes upon the ground that they failed to state a cause of action.

On April 10, 1964, Leila also filed in the adoption proceedings her petition to set aside the decree. Her grounds were those alleged in the third and fourth causes of action of Ellen's petition. A third cause of action set up by Leila was abandoned.

A demurrer to Leila's petition was overruled.

As a result of the trial the court found in two separate sets of findings that the Nevada divorce decree was valid; that for more than six weeks prior to the commencement on April 20, 1943, of the divorce action, Charles had been a bona fide resident of the State of Nevada; that Leila had appeared in the divorce action by an answer that admitted the allegations of the complaint that Charles was a resident of and had been present in Nevada more than six weeks before the filing of the complaint; that Leila had appeared in the Nevada action after she had consulted an attorney of her own choice; that Charles had not coerced, intimidated, menaced, exerted undue influence upon, or practiced fraud upon Leila in the matter of her appearing in the divorce action; that Leila was given full opportunity to contest the matter of Charles' alleged residence in Nevada; that neither Leila nor Ellen had notice or knowledge of the adoption prior to the death of Charles; that Charles was an unmarried man at the time of the adoption.

In the separate set of findings dealing with Ellen's petition,

the court found that Ellen is interested in this case by virtue of her claim to be the sole heir of Charles.

In the separate set of findings dealing with Leila's petition, the court found that she had received $30 or more per month from Charles since the divorce; that she did not prior to the death of Charles actively and legally assert the invalidity of the Nevada decree.

The court concluded that Ellen did not have standing to attack the adoption order or the divorce decree; that neither Ellen nor Leila had been entitled to notice of the adoption proceedings; that any cause of action that either might have had was not barred by the provisions of section 227d of the Civil Code; that the Nevada decree dissolved the marriage of Charles and Leila; that Leila was estopped to attack the validity of the Nevada decree by reason of her acceptance of the $30 per month provided by the decree, and was guilty of laches in not having, during the lifetime of Charles, attacked by legal action the validity of the divorce decree.

### Leila's Petition

The position taken by Leila was that Charles went to Nevada from their home in Glendora, California, for the sole purpose of getting a divorce and with the intention of returning to California as soon as he should obtain the decree; that in fact he spent less than six weeks in Nevada, since he went from Nevada to Cedar Rapids, Iowa, at the time of his mother's death and before the filing of the divorce action; that in signing the answer with its admissions, she was being threatened by Charles with unpleasant disclosures when she was in poor health, 63 years of age and in need of support.

### Leila's Legal Contentions

It will not be necessary to discuss all of Leila's contentions because her rights stand or fall with the legality of the divorce decree.

As a party to the divorce action, she may attack the decree only if she had been denied full opportunity to contest the jurisdictional issues. Since she appeared in the action and admitted the allegations of the complaint, she had, *prima facie* at least, the opportunity to contest the question of domicile, and unless the *prima facie* showing has been overcome she may not contest the decree. (*Heuer* v. *Heuer*, 33 Cal.2d 268 [201 P.2d 385]; *Coe* v. *Coe*, 334 U.S. 378 [68 S.Ct. 1094, 1097, 92 L.Ed. 1451, 1 A.L.R.2d 1376].)

In *Aldabe* v. *Aldabe*, 209 Cal.App.2d 453 [26 Cal.Rptr. 208], relied upon by Leila, the trial court refused to receive evidence tending to show extrinsic fraud that denied her day in court to the party seeking to attack a Nevada divorce decree. The direction of the court of appeal in reversing was to admit the excluded evidence and "to determine whether or not Alvera actually had her day in court in the Nevada proceeding."

Leila has sought by her claim of coercion, fraud and undue influence to bring her case within the field of inquiry permitted by *Heuer* v. *Heuer, supra,* 33 Cal.2d 268, *Coe* v. *Coe, supra,* 334 U.S. 378 [68 S.Ct. 1094, 1097, 92 L.Ed. 1451, 1 A.L.R.2d 1376], and *Sherrer* v. *Sherrer,* 334 U.S. 343 [68 S.Ct. 1087, 1097, 92 L.Ed. 1429, 1 A.L.R.2d 1355].

There was evidence from which conflicting inferences might have been drawn as to whether Leila's appearance in the Nevada action was a voluntary act free from improper influence that might have prevented her from contesting the court's jurisdiction which was based upon the claimed Nevada domicile of Charles. Upon such conflicting evidence the court decided against Leila's claim that she was denied her day in court.

The court found that Leila was not physically present in Nevada during the divorce proceedings. Her physical presence was not a necessary element of participation in the proceedings; it was at most a circumstance to be considered with other evidence in passing upon the question whether she had full opportunity to contest jurisdiction.

Leila contends that there was no substantial evidence to support the finding that her appearance in the Nevada divorce was free and voluntary. It is unnecessary to recapitulate her testimony and other evidence bearing on the subject. She did testify, however, that there was not anything concerning which she wished to avoid publicity at the time she received a letter from Charles' Nevada attorney requesting her to enter an appearance to avoid publicity; she consulted two attorneys of her own choice, the second of whom sent on her answer with a letter setting forth his understanding of what she was to receive; that was on May 11, although Charles had brought the prepared answer to her on May 5; she consulted another attorney in 1951 when she thought Charles might remarry, to see that some provision for her made in an earlier will would not be endangered; and that Charles came to her house often after the divorce.

Additionally, upon conflicting evidence, the court found that Charles had residence in Nevada sufficient to enable him to submit the question of his matrimonial status to the Nevada court. That a contrary finding would have found support in evidence does not permit us to upset the decision of the trier of fact in resolving the conflict. (*Estate of Paul*, 77 Cal.App. 2d 403, 408 [175 P.2d 284].)

Leila's claim that the Nevada decree is void upon its face is based upon a certain question and answer in the transcript of the testimony before the Nevada court, which was received in evidence during the trial of this proceeding. That question and answer are: "Q. Did you come here with the fixed purpose of making this your future residence?

"A. I did. I have to be away settling up certain things, but I will come back eventually."

Leila interprets that to mean that, as of the time of testifying, Charles meant to make Nevada his future residence; it is equally possible to interpret it as meaning that at the time of coming to Nevada Charles meant to make Nevada his place of residence for all future time.

Leila contends she should not be estopped to attack the Nevada decree because of having accepted from Charles the $30 per month called for by the decree, which by about 1952 had become $65 per month. She would have been entitled to support from him in any event. (*Estate of McNutt*, 36 Cal. App.2d 542 [98 P.2d 253].)

The other fully supported findings make it unnecessary to consider the correctness of the court's finding of estoppel.

The correctness of the court's finding of laches could be questioned successfully only if the Nevada decree were void on its face; we hold that it was not.

The finding that Leila had had her day in court compelled the conclusion that the Nevada decree was entitled to full faith and credit. The reception into evidence of a post card postmarked February 18, 1943, claimed to be error, did not affect that factual determination, but bore upon the court's finding that Charles was a resident of Nevada for the required time. That finding was not essential to the decision since the Nevada decree was nonetheless entitled to full faith and credit.

Likewise, the receipt into evidence of a letter purporting to have been written on behalf of Ellen to the trustee in Iowa in which mention was made of a rumored adoption by Charles did not affect the decision since the court found that neither

Ellen nor Leila knew of the adoption before the death of Charles.

Leila contends that the trial court committed error in reading, prior to trial, a trial brief submitted by Eleanor which contained excerpts from Leila's deposition. The deposition was not read into evidence. Leila claims, therefore, that the court considered evidence not introduced at the trial. However, Leila testified at the trial and a part of her testimony was to the same effect as that quoted by the trial brief from her deposition.

We conclude that the judgment denying Leila's petition must be affirmed.

### The Petition of Ellen

Ellen's petition to set aside the adoption by direct attack based upon the claimed invalidity of the Nevada divorce was properly denied. She was not in a position to attack the adoption decree for failure to obtain the consent of one whose consent was not required. Even had Leila's consent been required, Ellen could not build a case upon the lack of such consent, which could be urged only by Leila. (*Estate of Smith,* 86 Cal.App.2d 456, 468 [195 P.2d 842] ; *In re Williams,* 102 Cal. 70 [36 P. 407, 41 Am.St.Rep. 163] ; *Magevney* v. *Karsch,* 167 Tenn. 32 [65 S.W.2d 562, 92 A.L.R. 343].) The lack of such consent would not have made the adoption decree void so as to permit application of the rule relied upon in *Estate of Pusey,* 180 Cal. 368 [181 P. 648]. In fact, the direct effect of the setting aside of the divorce decree would be to diminish Ellen's interest as heir of Charles under both California and Iowa law. If Leila were the surviving spouse of Charles, she would succeed to one-half of his estate, assuming that Ellen also was an heir.

It follows that neither Ellen's rights as a putative heir to Charles' estate, nor as contingent beneficiary of the trusts in Iowa, were directly affected adversely by the Nevada divorce decree, and that she had no standing to attack that decree. This does not deny the possibility that one whose rights as heir are affected by a judgment to which he was not a party may subject the judgment to collateral attack, although the circumstances are such that the judgment may not be attacked by a party to it (*Estate of Pusey, supra,* 180 Cal. 368; *Williams* v. *North Carolina,* 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366]), provided the person seeking to attack it does not stand in the shoes of a party to the judgment. (*Johnson* v. *Muelberger,* 340 U.S. 581, 587-588 [71 S.Ct. 474,

478, 95 L.Ed. 552, 557-558] ; *Sellers* v. *Sellers,* 231 Cal.App.2d 866 [42 Cal.Rptr. 276] ; *Brill* v. *Brill,* 38 Cal.App.2d 741 [102 P.2d 534] ; *Old Colony Trust Co.* v. *Porter,* 324 Mass. 581 [88 N.E.2d 135, 12 A.L.R.2d 706].) However, it is as heir of Charles that Ellen seeks to attack the Nevada decree. What Charles would have been estopped to do in his lifetime, Ellen claiming under him as his heir may not do. (*Estate of Davis,* 38 Cal.App.2d 579 [101 P.2d 761, 102, P.2d 545].) It follows that Ellen's third and fourth causes of action did not state facts entitling her to the relief she seeks.

We next consider whether the demurrer to Ellen's first and second causes of action was properly sustained: Whether she may attack the adoption decree on grounds other than the failure to give notice of the adoption proceedings to Leila.

A distinction should be drawn between the claimed rights of Ellen as a putative heir of Charles and her vested rights as a contingent beneficiary of the Iowa trusts. It is asserted by Eleanor that neither right vested until the death of Charles. That assertion is erroneous. Ellen's contingent interest vested when the trusts were created. (*Estate of Lefranc,* 38 Cal.2d 289, 297 [239 P.2d 617] ; *Gray* v. *Union Trust Co.,* 171 Cal. 637, 642 [154 P. 306] ; *Estate of Zuber,* 146 Cal.App.2d 584 [304 P.2d 247] ; *Estate of Baird,* 135 Cal.App.2d 333, 341 [287 P.2d 365].) In that respect Iowa's law is the same as California's. (*McDonald* v. *Bayard Sav. Bank,* 123 Iowa 413 [98 N.W. 1025].) Under both California and Iowa law, contingent remaindermen have such an interest as a court of equity will protect. (*Pavkovich* v. *Southern Pacific R.R. Co.,* 150 Cal. 39 [87 P. 1097] ; *Katz Inv. Co.* v. *Lynch,* 242 Iowa 640 [47 N.W.2d 800, 806].)

As to one of those claimed rights, Ellen stands in the shoes of Charles; but the other right is independent of Charles and derives from the creator of the trusts.

Although Ellen's interest as contingent beneficiary of the Iowa trusts had vested prior to the adoption, she would not have been entitled to oppose the adoption at the time of the hearing on the petition for adoption for the protection of that interest. Had she been aware of the adoption proceeding she might, no doubt, have been permitted to bring to the attention of the court the fact that one of the parties was mentally incompetent, if such were the fact.

We do not recognize that she had a right to be informed of the pending adoption petition; nor that the concealment of the

facts concerning the adoption decree was as to her the conceal-
ment of facts giving rise to a cause of action.

Concealment of the existence of the adoptive relationship
might nevertheless be a circumstance to be considered if there
were other evidence sufficient to support the allegations of
fraud on the part of Eleanor.

Ellen, however, should not be wholly without a remedy if in
the matter of the adoption Charles was the victim of fraud,
the overpowering effects of which continued until his death.[1]

The right of heirs of an adopting parent of an adult adoptee
to attack an adoption decree upon the ground of the mental
incompetency of the adopting parent or of fraud, duress or
undue influence practiced upon the adopting parent by the
adult adoptee, or by another person who stands to gain by
inheritance from a deceased adoptee, has been recognized in
Massachusetts (*Tucker* v. *Fisk*, 154 Mass. 574 [28 N.E. 1051];
*McKay* v. *Kean*, 167 Mass. 524 [46 N.E. 120]; *Raymond* v.
*Cooke*, 226 Mass. 326 [115 N.E. 423]; *Phillips* v. *Chase*, 201
Mass. 444 [87 N.E. 755, 131 Am.St.Rep. 406]; *Phillips* v.
*Chase*, 203 Mass. 556 [89 N.E. 1049, 17 Ann.Cas. 544, 30
L.R.A. N.S. 159]), New York (*Stevens* v. *Halstead*, 181 App.
Div. 198 [168 N.Y.S. 142][2]), Missouri (*Wilson* v. *Caulfield*,
228 Mo.App. 1206 [67 S.W.2d 761]), and Kentucky (*Greene* v.
*Fitzpatrick*, 220 Ky. 590 [295 S.W. 896]). The Indiana court
has given recognition to the principle. (*State* ex rel. *Bradshaw*
v. *Probate Court of Marion County*, 225 Ind. 268 [73 N.E.2d
769, 772].)

California has set aside adoption decrees affecting infants
where the consent of a natural parent was obtained by fraud
(*Arnold* v. *Howell*, 98 Cal.App.2d 202 [219 P.2d 854]), and
where there were other circumstances of fraud. (*Bell* v.
*Krauss*, 169 Cal. 387 [146 P. 874]; *In re Yoder*, 199 Cal. 699
[251 P. 205]; *Miller* v. *Higgins*, 14 Cal.App. 156 [111 P. 403];
*Adoption of Emery*, 191 Cal.App.2d 428 [12 Cal.Rptr.
685].)

If the right, under certain circumstances, of the heirs of a
party to an adult adoption to attack the adoption decree is to

---

[1] Alleged continuing duress does not toll the statute of limitations
(*Marshall* v. *Packard-Bell Co.*, 106 Cal.App.2d 770, 774 [236 P.2d 201]);
so continuing undue influence would not, although cases from foreign
jurisdictions mentioned in *Marshall* v. *Packard-Bell Co.*, *supra*, hold that
undue influence persisting until death of the object thereof will toll the
statute for a cause of action based upon undue influence.

[2] *In re Adoption of Brundage*, 134 N.Y.S.2d 703, a trial court decision,
contains dictum to the contrary; there were specific findings that there
was no fraud or undue influence.

be recognized in California, is it to be asserted by direct attack in the adoption proceeding, or in an independent suit in equity?

In the following cases, the attack was held properly made in the adoption proceeding: *Greene* v. *Fitzpatrick, supra,* 295 S.W. 896; *Tucker* v. *Fisk, supra,* 28 N.E. 1051. A direct attack by action in equity was held proper in *Wilson* v. *Caulfield, supra,* 67 S.W.2d 761; *Stevens* v. *Halstead, supra,* 168 N.Y.S. 142.

Some of the attacks upon infant adoption in California for fraud or mistake have been made in the adoption proceedings (*In re Yoder, supra,* 199 Cal. 699; *Adoption of Emery, supra,* 191 Cal.App.2d 428); others have been made in separate actions in equity (*Bell* v. *Krauss, supra,* 169 Cal. 387; *Arnold* v. *Howell, supra,* 98 Cal.App.2d 202; *Miller* v. *Higgins, supra,* 14 Cal.App. 156).

It is only when the defrauded, unduly influenced or mentally incompetent adoptive parent might himself attack the adoption decree during his lifetime that his heirs may do so. If the adopting parent might not make the attack, neither may the heir. (*Estate of Camp,* 131 Cal. 469, 471 [63 P. 736, 82 Am.St.Rep. 371]; *Estate of McKeag,* 141 Cal. 403 [74 P. 1039, 99 Am.St.Rep. 80]; *In re Williams, supra,* 102 Cal. 70.)

What right, then, had Charles during his lifetime to attempt to set aside the adoption decree and agreement for adoption? A decree obtained by extrinsic fraud may be set aside at any time. (*Estate of Estrem,* 16 Cal.2d 563, 571-572 [107 P.2d 36].) Fraud is extrinsic when it denies an adversary hearing to a party bound by a judgment obtained by the party benefitted by the judgment through the exercise of such fraud.

We cannot, as between the parties to an adoption proceeding, speak of an adversary proceeding or hearing. We can, however, in an adult adoption proceeding, speak of a fair hearing, voluntarily participated in with an understanding of the nature of the proceedings.

In *Arnold* v. *Howell, supra,* 98 Cal.App.2d 202, the court said: "A consent which is required before a court can act, and which is based upon misrepresentation or given by a person who is unable to comprehend its meaning, prevents a fair and full hearing of the issues which the court is required to determine. (P. 206.)

". . . . . . . . . . . . . .

"Appellant alleges specific promises on the part of Alethea and Edith that he would regain the custody of his daughter

after his return from overseas. This is a type of fraud which a court with equitable powers may consider. (31 Am.Jur. 241.)'' (P. 208.)

If the adoption agreement was the result of fraud practiced by Eleanor on a person who was mentally incompetent and continued to be so until death occurred, it could not be said that Charles participated voluntarily in the adoption proceeding.

In *Olivera* v. *Grace,* 19 Cal.2d 570 [122 P.2d 564, 140 A.L.R. 1328], the personal representative of a deceased incompetent brought an independent action in equity to set aside a default judgment taken against the incompetent some 28 months earlier, of which the plaintiff obtained information only after the death of the incompetent. The personal representative had been appointed guardian of the incompetent when she was judicially declared to be such some nine months before the action was commenced. Judgment on the sustaining of a demurrer was reversed.

The effect of setting aside an adoption decree is the termination of a status created by the decree. The same effect would be achieved by the death of one of the parties to the adoption. To the argument that since death has intervened to produce the termination of the status, the setting aside of the decree would be a work of supererogation, the answer may be that given in *McGuinness* v. *Superior Court,* 196 Cal. 222 [237 P. 42, 40 A.L.R. 1110], in setting aside a divorce decree after the death of one of the parties: The court may purge its records of a decree entered as the result of extrinsic fraud.

We need not decide whether California should follow Massachusetts, New York and other states in recognizing an independent right of action in the heir of the adopting parent in an adult adoption proceeding to set aside the adoption decree obtained by the fraud of the adult adoptee.

California does recognize, under certain circumstances, the right of the heir of a decedent to enforce a derivative right of action possessed by the decedent, or a cause of action that has accrued in favor of his personal representative.

Those circumstances are found when the cause of action is against one who is acting as personal representative of the decedent. In that situation, moreover, a demand upon the personal representative to bring the action is unnecessary. (*Landis* v. *First National Bank,* 20 Cal.App.2d 198 [66 P.2d 730].)

If, therefore, Charles had a cause of action against Eleanor, who is acting as special administratrix of his estate, one who

stands to benefit by the successful prosecution of the action has a right to commence it.

Charles or his personal representative might have moved to set aside the adoption decree in the adoption proceeding as well as by a suit in equity. (*McGuinness* v. *Superior Court, supra,* 196 Cal. 222; *Olivera* v. *Grace, supra,* 19 Cal.2d 570, 576.) To the extent that Charles had such right, it may be asserted by Ellen in the same manner.

As to the Iowa trusts, Iowa will accord full faith and credit to a California adoption decree that is not void upon its face and will give to it the same effect upon the rights of inheritance of personalty as does California. (*Cook* v. *Todd's Estate,* 249 Iowa 1274 [90 N.W.2d 23, 66 A.L.R.2d 1257].)

We apprehend, also, that an Iowa court would not entertain an action that attempted to set aside a California adoption decree upon the ground of fraud in its obtainment.

If the right to move to set aside the adoption decree exists, derived from Charles, the successful assertion of that right would affect not only the right of inheritance as to the California estate, but the determination of heirship as to the Iowa trusts.

Since the maturing of her right as contingent remainderman depends upon her being the direct heir of Charles, Ellen should as to that status in relation to the Iowa trusts have the same right to assert any cause of action that Charles may have had to set aside the adoption decree.

The first and second causes of action in Ellen's second amended petition fail to allege that a contest had been filed against the probate of the will. There has been such a will contest, and the petition could be amended to allege that necessary fact to show Ellen's potential right to share in the estate of Charles. The petition is perhaps uncertain also as to the degree of Charles' alleged mental illness.

There is also in the first cause of action the mention of a trip to Europe made by Charles after the adoption, which seems inconsistent with a claimed senility and inability to discover facts concerning the alleged fraud, unless the trip were made under the tutelage of Eleanor. All in all, the problems of proof of Ellen's allegations may be almost insurmountable. With that subject, however, we are not here concerned. (*Henry George School of Social Science* v. *San Diego Unified School Dist.,* 183 Cal.App.2d 82, 88 [6 Cal.Rptr. 661]; *Katenkamp* v. *Union Realty Co.,* 6 Cal.2d 765, 769 [59 P.2d 473].)

We are concerned only to make it clear that fraud practiced in an adult adoption is not the one kind of fraud that may go

free from attack because of the death of the victim of the fraud.

### The Question of Limitations.

The court sustained, without leave to amend, the demurrer to the first and second causes of action on the ground that neither stated facts sufficient to constitute a cause of action in Ellen.

The parties have disputed the effect of the ruling on the demurrer. Eleanor says that the court sustained the demurrer for failure to state facts sufficient to constitute a cause of action because the cause of action appeared to be barred by the statute of limitations. Ellen says that the order sustaining the demurrer, being general in its terms, could not have been made upon the ground that the cause of action appeared to be barred.

█ If it is now important to decide the question, we hold that the sustaining of the demurrer upon the general grounds was not because the cause of action appeared to be barred by limitations. A complaint that shows upon its face that the cause of action is barred by limitations is subject to demurrer upon the ground that it fails to state a cause of action, but the demurrer must specify that such failure exists because the cause of action appears to be barred by limitations. (*California Safe Deposit etc. Co.* v. *Sierra etc. Co.,* 158 Cal. 690, 698 [112 P. 274, Ann.Cas. 1912A 729] ; *Brown* v. *Martin,* 25 Cal. 82, 91.) Eleanor's demurrer to the first and second causes of action made upon the general grounds made no mention of the statute of limitations.

█ The question for decision is whether Ellen's petition to set aside the decree is barred by the provisions of section 227d, Civil Code, as contended by Eleanor. If it is not barred by that section, then it was timely brought, since the allegations of the petition are sufficient or are capable of being amended to show that Charles did not discover and reasonably should not have discovered the fraud during his lifetime. Section 338, subdivision 4, Code of Civil Procedure, would then apply; so far as Ellen herself is concerned, the court's finding that she did not know of the adoption until after the death of Charles fixes the date of his death as the earliest date at which the period of limitations would have commenced.

Section 227d, Civil Code, is as follows: ''Any action or proceeding of any kind whatsoever to vacate, set aside, or otherwise nullify a decree of adoption on the ground of any defect or irregularity of procedure in the adoption proceeding must

be commenced within three years after entry of the decree. Any action or proceeding of any kind whatsoever to vacate, set aside, or otherwise nullify a decree of adoption on any ground other than a defect or irregularity of procedure must be commenced within five years after entry of the decree. In any case in which the decree of adoption was entered before the effective date of this section, the period of limitation prescribed in this section shall run from and after such effective date.''

On its face and considered by itself, section 227d is unambiguous as to its applicability to all decrees of adoption whether of infants or adults. So viewed, there would be, under the general rule, no room for construction of the section. (*Ross* v. *City of Long Beach,* 24 Cal.2d 258, 261 [148 P.2d 649].)

Any doubt arises, not from the language of section 227d, but from the relation of that section to other sections dealing with the subject of adoptions. Generally speaking, statutes should be construed in the light of other statutes dealing with the same subject matter. (*City of National City* v. *Fritz,* 33 Cal.2d 635, 637 [204 P.2d 7].)

Section 221, Civil Code, as amended in 1951, reads in part as follows: ''Any unmarried minor child may be adopted by any adult person, in the cases and subject to the rules prescribed in this chapter other than in Section 227p, and any adult person or married minor child may be adopted by any other adult person in the cases and subject to the rules prescribed in Section 227p.''

By the terms of section 221, the rules prescribed by section 227d apply to adoptions of infants; but only 227p applies to adoptions of adults.

Broad and all-inclusive provisions of a statute may be limited by the provisions of another statute dealing with the same general subject matter. (*Hough* v. *McCarthy,* 54 Cal.2d 273, 278 [5 Cal.Rptr. 668, 353 P.2d 276] ; *Wentworth* v. *L. & L. Dining Co.,* 116 Conn. 364 [165 A. 203, 204].)

 The need for consideration of section 227d arises, therefore, from its relation to section 221. The ambiguity might be said to be analogous to a latent as contrasted with a patent ambiguity.

In considering whether section 227d applies to adoptions of adults, notwithstanding the provisions of section 221, resort may be had to the usual aids to construction. (*People* v. *Knowles,* 35 Cal.2d 175, 182 [217 P.2d 1].) In *People* v. *Knowles, supra,* 35 Cal.2d 175, 183, it is said: ''If the words of the statute are clear, the court should not add to or alter them

to accomplish a purpose that does not appear on the face of the statute *or from its legislative history."* [Italics added.]

Construction is the drawing of conclusions respecting subjects that lie beyond the direct expression of the text, from elements known from and given in the text. (*United States* v. *Farenholt,* 206 U.S. 226 [27 S.Ct. 629, 631, 51 L.Ed. 1036].)

In construing a statute, the court is free to study the history and purpose of the enactment and the previous state of the legislation on the subject, as well as other statutes *in pari materia* and the benefits sought to be provided. (*County of Los Angeles* v. *Frisbie,* 19 Cal.2d 634, 639 [122 P.2d 526].)

Prior to enactment in 1951 of Civil Code, section 227p, it was not possible within the State of California to adopt an adult.

Although section 227d also became law in 1951, the two sections have different legislative histories. Section 227d, chapter 638, Statutes of 1951, originated as Assembly Bill 856, was introduced into the Assembly on January 15, 1951, and was passed by the Assembly on April 13, 1951, and by the Senate on May 10, 1951. Section 227p, chapter 880, Statutes of 1951, introduced on January 16, 1951, as Senate Bill 526, was passed by the Senate on April 19, 1951, and by the Assembly on May 22, 1951.

The 1951 amendment of section 221 heretofore quoted also was a part of chapter 880.

The title of chapter 638 is as follows: "An Act to amend Sections 224, 224p, 226a, and 226b of the Civil Code, and to add Section 227d thereto, relating to the adoption of children."

Chapter 880 of the Statutes of 1951 was entitled: "An Act to amend Section 221 of and to add Section 227p to the Civil Code, relating to the adoption of adults."

In the construction of statutes, where there is doubt or ambiguity, resort may be had to the title, which, though not conclusive, is a legitimate aid in arriving at the legislative intent. (*Aebli* v. *Board of Education,* 62 Cal.App.2d 706, 738 [145 P.2d 601].)

Although sections 227d and 227p became law on the same date, section 227d is one of a number of particles of section 227 identified separately by an unbroken series of alphabetic lettering, all dealing with the adoption of minors. Section 227d is followed immediately by section 227p, separated from it by a gap in the lettering probably intended to

take care of future additions to the provisions having to do with infant adoptions.

In *Ahern* v. *Livermore Union High School Dist.*, 208 Cal. 770, 780 [284 P. 1105], it is stated with regard to two statutes passed at the same session of the Legislature, of which one passed both houses and was approved by the Governor before the other: "It would, therefore, be most unreasonable to hold that the statute first enacted was to be limited by the terms of the later enactment simply because the bills providing for each statute were before the legislature at or about the same time. Unless there is something in the terms of the statute or in the subject matter of the two acts indicating that one is subject to the other, each must stand as a complete expression of the legislative intent upon the particular subject embraced therein."

Of the statutes with which we are here concerned, chapter 880 referred to the code chapter of which the code sections that were adopted or amended by chapter 638 are a part. It follows that the enactment of section 227d was in the minds of the Legislature in amending section 221, and that in doing so they declared infant adoptions to be subject to the rules of section 227d, but did not declare adult adoptions to be so subject.

The only judicial consideration of section 227d to be found in the reported decisions is in *Walter* v. *August*, 186 Cal.App. 2d 395 [8 Cal.Rptr. 778, 83 A.L.R.2d 941], which gave effect to the section in an action brought by natural parents to set aside the adoption decree of their infant child because of a defect in earlier proceedings to have the child declared free from parental custody, when they had known of the adoption decree within six weeks and took no action to set the decree aside for more than five years after its entry. In applying section 227d, the court said: "No doubt the Legislature felt that the possible damage to a child who has been in an adoptive home for five years and is then removed from it by his natural parents is so great as to outweigh the rights of the natural parents." (P. 399.)

None of the factors emphasized by the court of appeal in *Walter* v. *August, supra,* 186 Cal.App.2d 395, is found in the instant case, The considerations ascribed to the legislative purpose in adopting section 227d are dicta with regard to the present facts, but the views of the court in *Walter* v. *August, supra,* are entitled to respect.

Speaking only of infant adoptions, the court said, in *Walter* v. *August, supra,* 186 Cal.App.2d 395, 400: "It might be possible to imagine a case which would be of such a character that a court would feel compelled to construe section 227d as admitting of some exception, but this is certainly not such a case."

It may be that the court, in using the quoted language, had in mind a situation such as that of the parents of a child kidnapped from them in another state, and brought to California where the child finally comes within the jurisdiction of the probation and welfare departments, is by court action freed from the custody of its unknown and unknowing parents and then declared adopted, all without any fault of, knowledge by or notice to the natural parents.

To say that section 227d cuts off absolutely all right of action five years after an adult adoption decree would, in spite of the provisions of section 352 of the Code of Civil Procedure, deny his day in court to a person under the disability of insanity at the time the cause of action arose and who continued under such disability for five years thereafter; and it would cut off the right of action of a person such as Charles is alleged to be who has suffered a wrong through the fraud of another of which without fault be remains unaware for a period of five years.

It is an accepted rule of statutory construction that it is not to be presumed that the Legislature, in the enactment of statutes, intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication. (*County of Los Angeles* v. *Frisbie,* 19 Cal.2d 634, 644 [122 P.2d 526].)

We deem it clear that the Legislature did not intend, in section 227d, to alter, with regard to persons of legal age, the longstanding rule that, as to a suit in equity to set aside a decree on the ground of extrinsic fraud, the period of limitations commences to run only when the fraud is or reasonably should be discovered.

It is wholly reasonable that the legislative intention is as we have concluded because, as expressed by a student of the subject of adoptions: ". . . the social interest in adult adoptions and the problems involved in the administration of the program are quite different from the social interest and problems involved in the program for the adoption of minors and particularly infants." (6 Hastings L. J., *California's Adoption Law and Programs,* by Jacobus ten Broek, p. 265.)

The judgment as to Ellen is reversed insofar as it is based upon the sustaining, without leave to amend, of the demurrer to the first and second causes of action of her second amended petition, with directions that she be permitted to amend to allege the existence of the will contest and such other matters as she may truthfully allege. In all other respects, the judgments are affirmed.

Respondent shall recover her costs on appeal from appellant Keeler. Appellant Schaefer shall recover from respondent as costs on appeal one-half of the cost of the clerk's transcript and of the cost of briefs on appeal; in other respects she shall bear her own costs.

Brown, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied May 27, 1966, and appellants' petition for a hearing by the Supreme Court was denied July 6, 1966.